653 A.2d 1029

MARYLAND GENERAL HOSPITAL et al.

v.

MARYLAND HEALTH RESOURCES
PLANNING COMMISSION et al.

No. 1243, Sept. Term, 1994.

Court of Special Appeals of Maryland.

Feb. 14, 1995.

Gregory M. Luce (Jones, Day, Reavis & Pogue, on the brief), Washington, DC, for appellant Maryland General Hosp.

Marta D. Harting (Kurt J. Fischer and Piper & Marbury on the brief), Baltimore, for appellant, St. Agnes Hosp.

Joel Tornari, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., and Daniel J. O'Brien, Jr., Asst. Atty. Gen., on the brief), Baltimore, for appellee, Maryland Health Resources Planning Com'n.

James J. Doyle, Jr. (Mary R. Craig, and Doyle & Craig, P.A., on the brief), Baltimore, for appellee, Union Memorial Hosp.

Argued before WILNER, C.J., and CATHELL and HOLLANDER, JJ.

WILNER, Chief Judge.

This appeal arises from a competition among three Balti-more-area hospitals—Union Memorial, Maryland General, and St. Agnes—to obtain a Certificate of Need (CON) to establish an Open Heart Surgery/Percutaneous Transluminal Coronary Angiography (OHS/PTCA) unit. When the Health Resources Planning Commission awarded the CON to Union Memorial, Maryland General and St. Agnes sought judicial review of the award in the Circuit Court for Baltimore City. That court affirmed the Commission award, and we now have this appeal, raising both procedural and substantive issues. We shall affirm.

## BACKGROUND

In an effort to assure an efficient and effective health care system for Maryland, the General Assembly created the Health Resources Planning Commission (the Commission) and charged it with developing, adopting, periodically updating, and implementing a State Health Plan. *See,* in general, Md.Code, Health–General art., §§ 19–101–19–123. The principal mechanism for implementing the plan is the requirement in § 19–115 that health care facilities obtain a CON from the

Commission before commencing any major change in their plant or operation. The Commission is directed to include in the State Health Plan standards and policies relating to the CON program—standards addressing the availability, accessibility, cost, and quality of health care. § 19–114(e). The Commission has done so. *See* COMAR, title 10, subt. 24, ch. 01.

In October, 1990, the State Health Plan for Cardiac Surgery and Therapeutic Catheterization Services—that part of the State Health Plan at issue here—was amended to project the need for one additional OHS/PTCA program in the Baltimore Metropolitan Planning Region. In January, 1991, preliminary letters of intent were filed by several metropolitan hospitals. In March, 1991, following preapplication conferences, formal applications for a CON were filed by five hospitals, including the parties to this appeal. After extensive review of the applications, the Commission staff, on March 29, 1992, recommended that Union Memorial be awarded the CON. The Commission then designated Commission-member James T. Estes as a hearing officer to conduct an evidentiary hearing.

The proceeding before the Commission was a "comparative review," i.e., the review of two or more applications for similar projects serving the same or overlapping service areas. *See* COMAR 10.24.01.07B(2). At issue was not simply whether a particular applicant satisfied the basic criteria for a CON, but which of the applicants best satisfied the criteria. In that regard, the Commission was obliged to consider the eight criteria set forth in COMAR 10.24.01.07H, a general regulation governing the procedure for considering applications for CONs. Among those criteria are (1) consistency with the State Health Plan, (2) the availability of less costly or more effective alternatives for addressing the unmet needs identified by the applicants, (3) the immediate and long-term financial viability of the proposal, and (4) a positive impact on the existing health care system of the area.

We are informed that the State Health Plan for Cardiac Surgery and Therapeutic Catheterization Services itself con-

tains 17 standards and eight "approval policies" against which applications were to be judged. The COMAR requirement that applications be examined for consistency with the State Health Plan thus required the Commission to consider those standards and approval policies as well. A complete listing of the applicable standards and approval policies does not appear either in COMAR or in the record extract or any of the briefs.[1]

Taking account of these standards and approval policies and the other criteria stated in the regulation, Dr. Estes identified 18 Genuine Issues raised by the applications, some of which pertained to all of the applicants, others to one or more but less than all of them. Among those issues were:

"Issue 12: Which applicant is least costly? The analysis may include costs of any particular program, including existing as well as proposed programs, to the health care system.

Issue 13: Are each hospital's OHS/PTCA financial and operating projections reasonable?

Issue 15: What would be the impact of an OHS/PTCA program at each applicant hospital on each applicant's hospital operations, including the impact of an OHS/PTCA program on the overall financial viability of the provider?"

In May, 1992, the applicants each submitted "pre-filed" written testimony supporting their respective applications and addressing the 18 Genuine Issues identified by Dr. Estes. Hearings were then held in June and July, during which the applicants were allowed to cross-examine the witnesses produced by the other applicants. On August 31, the Commission

---

1. COMAR 10.24.17.01 incorporates the plan for Cardiac Surgery and Therapeutic Catheterization Services "by reference," as does the Notice of Final Action adopting that part of the plan. *See* 17 Md. Register 2428 (October 5, 1990). An Editor's Note to the Notice of Proposed Action, published in 17 Md. Register 1526–27 (June 15, 1990), states that the document "has been declared a document generally available to the public and appropriate for incorporation by reference" and that copies had been filed in "special public depositories located throughout the State."

staff and the applicants each filed their rebuttal testimony; the staff confirmed its earlier recommendation that the CON go to Union Memorial. Cross-examination on the rebuttal testimony occurred in September, 1992. On November 9, 1992, following the filing of closing and reply briefs, the record was closed.

The day the record was closed, Maryland General filed a Motion to Reopen the Record and Admit Information of Material Changes in Financial Projections of Union Memorial Hospital. The point of this motion, which we shall discuss in further detail later, was to challenge certain testimony given by Edward Kelly, Union Memorial's chief financial officer, with respect to (1) Union Memorial's projected FY 1992 income in light of its later-published audited FY 1992 statement and (2) its request of the Health Services Cost Review Commission for a retroactive rate adjustment.

The hearing officer initially referred the issue raised with respect to the retroactive rate adjustment to John Colmers, Executive Director of the Cost Review Commission who, on December 10, 1992, reported that Union Memorial's request for rate adjustment had no impact on the hospital's financial viability. Dr. Estes then reopened the record to allow cross-examination of Messrs. Colmers and Kelly. An additional hearing for that purpose was held on February 8, 1993. On February 16, St. Agnes asked the hearing officer to direct Union Memorial to have its accountants produce certain working papers related to the preparation of the 1992 statement. Three days later, Maryland General insisted that Dr. Estes make additional inquiries of the accountants. Those requests were denied, as were motions to reconsider the denials.

On April 23, 1993, Dr. Estes filed an 83–page opinion in which he recommended that Union Memorial receive the CON. The opinion consisted of a comparative analysis of the applications in terms of program effectiveness, cost, access for the underserved, and impact on the health care system. The entire opinion has not been reproduced in the record extract, presumably because the parties have not thought those parts

excluded to be germane. We shall therefore consider only the portions included in the extract.

Among the decisive factors considered by Dr. Estes were approval policies (7) and (8). Approval policies are, in essence, preferences, or tie-breakers; they come into play when all of the applicants otherwise would qualify for the CON because they meet all of the other standards and policies. Approval policies (7) and (8) provide as follows:

"Approval Policy (7) *Cost Effectiveness*

(a) In the case of a comparative review of applications in which all policies and standards have been met by all applicants, the Commission will give preference to the applicant which offers *the best balance between program effectiveness and costs to the health care system as a whole.*

(b) In evaluating the costs to the health care system as a whole, the Commission, in consultation with the Health Services Cost Review Commission (HSCRC), will:

(i) Determine each applicant's proposed net revenue per case on a case-mix adjusted and price leveled basis, taking into account any existing rate agreement with the HSCRC; and

(ii) Consider the implications of any special cost saving proposal offered by an applicant and the viability of this proposal.

Approval Policy (8) *Service to Minority and Indigent Populations.*

In the case of a comparative review of applications in which all policies and standards have been met by all applicants, the Commission will give preference to the applicant with an established cardiovascular disease prevention and early diagnosis program with particular outreach to minority and indigent patients in the hospital's Regional Service Area. In evaluating the applicant's implemented program, the Commission will take into consideration:

(a) The applicant's demonstrated record of serving minority and indigent patients with cardiovascular diseases; and

(b) The applicant's demonstrated record of establishing programs for outreach to the minority and indigent populations with cardiovascular diseases."

(Emphasis added.)

In considering "program effectiveness" in light of Approval Policy (7), Dr. Estes found, in relevant part, that:

(1) Union Memorial was the only applicant that will offer radio frequency ablation, a transportable intro-aortic balloon pump, and AICD implantation, indicating that the hospital's cardiology staff has pursued the education and expertise to establish the most advanced programs available for cardiac care;

(2) Union Memorial was the only applicant to have come forth with evidence of some form of external quality review concerning care of cardiac patients, this being evidence that the hospital currently offers a high quality cardiology program;

(3) The program should be awarded to a hospital that can best provide the support services necessary for a tertiary service such as OHS/PTCA, and that, overall, Union Memorial best demonstrates this support;

(4) Union Memorial, as a designated trauma center, offers certain advantages concerning availability of operating room staff and anesthesiology 24 hours per day, 7 days per week, and that that staff would have a different level of experience and advanced training in handling difficult emergency situations; and

(5) In summary, "because of the advanced technological benefits offered by the [Union Memorial] proposal, and because of the demonstrated record of high quality cardiac care and professional commitment to excellence ... [Union Memorial] is the most effective alternative with respect to program effectiveness."

Dr. Estes then discussed the element of "cost," from the point of view of both Approval Policy (7)—the required balance between program effectiveness and cost—and the re-

quirement in COMAR 10.24.01.07H(2)(d) that the Commission consider the immediate and long-term financial viability of the proposal. He found, in pertinent part:

(1) Union Memorial had substantiated its proposed budget, and that, although the projected operations of the entire hospital generate a loss, with the infusion of non-operating income the loss is offset and the project is financially feasible.

(2) Although the financial viability of Union Memorial became a particular issue following the close of the initial round of hearings, based on the evidence received at the February hearing, the Commission "continues to conclude that [Union Memorial] is a financially viable hospital and that the addition of an OHS/PTCA program is financially feasible for this hospital."

and

(3) With particular respect to the testimony of Mr. Kelly and the discrepancies regarding the 1992 figures, "[b]ased on the evidence presented, the Commission does not believe that there has been a deliberative attempt on the part of [Union Memorial] or Mr. Kelly to misrepresent the financial condition of [Union Memorial]" and, "while there may have been miscalculations or oversights in the projected FY 1992 financials, based on the testimony regarding changes in the financial management of [Union Memorial], there is no basis to believe that these miscalculations will continue into the future."

In terms of "cost to the system," Dr. Estes concluded that each of the proposals would result in cost-savings to the system.

Dr. Estes's conclusion from this comparative analysis was that all of the applicants offered financially viable proposals that were consistent with COMAR 10.24.01.07H(2)(d), that the net revenue offers and system cost implications were essentially equal, and that, accordingly, pursuant to its finding that Union Memorial presented the most effective program, that hospital deserved preference under Approval Policy (7).

After considerable discussion of the historic efforts made by each of the applicants to serve minority and indigent populations and the extent to which their proposed OHS/PTCA programs would serve those populations, Dr. Estes made a number of subordinate findings—some favoring Union Memorial, some favoring Maryland General, and some favoring St. Agnes—but he ultimately determined that none of the applicants was entitled to a preference under Approval Policy (8).

In his summary, Dr. Estes noted that, pursuant to the State Health Plan and COMAR criteria, the Commission was required to certify the provider who offered "the most effective program, who is financially sound, and who will improve access to the minority and indigent." All three applicants, he found, were approvable. He concluded, however:

"[Union Memorial] was found to warrant preference under Approval Policy 7 as the most effective program proposed. Further, although no particular preference was given under Approval Policy 8, [Union Memorial's] proposed OHS program will serve more minority and indigent than the proposal from [St. Agnes]. . . . In light of the [State Health Plan] mandate that a new project reach out and serve this population, in view of the negative impact [St. Agnes] will have on [University of Maryland Hospital], in view of the lack of strength of [Maryland General's] existing cardiology program and anticipated referral network, and in view of the superior clinical and related services program put forth by [Union Memorial], the Commission finds that the Certificate of Need in this review should be granted to [Union Memorial]."

Maryland General and St. Agnes filed exceptions. Maryland General filed with its exceptions another motion to reopen the record for further examination of Union Memorial's accountants. After a hearing on the exceptions, the Commission voted unanimously to adopt the proposed decision recommended by Dr. Estes.

Maryland General and St. Agnes sought judicial review in the Circuit Court for Baltimore City. In that court, both

hospitals, through separate motions, asked to have the record reopened to include the additional documents and material sought from Union Memorial's accountants. St. Agnes asked, in the alternative, to have that evidence presented to the court or for an order requiring the Commission to consider it. The court denied those requests, finding (1) no procedural error on the part of the Commission in refusing to allow the additional evidence, and (2) that, in light of the credibility determination made by Dr. Estes and the Commission with respect to Mr. Kelly, the additional evidence was essentially irrelevant. It did, however, direct Union Memorial's accountant, Ernst & Young, to produce the requested documents, which, upon receipt, were marked for identification but not admitted into evidence.

## THE ISSUES

Maryland General makes essentially three complaints: (1) the circuit court erred in refusing to consider the documents received from Ernst & Young and to remand the case for the Commission to consider those documents, (2) the Commission failed to afford due process of law when it refused to allow the additional cross-examination and documents sought by Maryland General, and (3) the court erred in refusing to apply the "substituted judgment" test in reviewing the Commission's misapplication of Approval Policies 7 and 8. St. Agnes essentially joins in Maryland General's first two complaints and adds three more—that the court erred in not admitting the Ernst & Young documents into evidence in the judicial review proceeding, that the Commission failed to find facts and articulate its reasoning, and that its decision is not based on substantial evidence.

## THE ADDITIONAL EVIDENCE

Md.Code, State Gov't art., § 10–222(f) provides generally that judicial review of agency decisions in contested cases is confined to the record made before the agency. It permits the reviewing court, upon timely application, to order the agency to take additional evidence if the court is satisfied that

the evidence is material and there were good reasons for the failure to offer it at the proceeding before the agency. Section 10–222(g)(2) allows the court itself to take and consider "*testimony* on alleged irregularities in procedure before the [agency] that do not appear on the record." (Emphasis added.)

## Section 10–222(g)(2)

■ We may quickly dispose of St. Agnes's argument that the court should have considered, under the authority of § 10–222(g)(2), the documents supplied by Union Memorial's accountants, Ernst and Young, pursuant to court subpoena. We note, first, that § 10–222(g)(2) refers specifically to "testimony" relating to alleged irregularities. Throughout the rest of that section, the law speaks of "evidence," not testimony.

In *Zipus v. United Rwys. & El. Co.*, 135 Md. 297, 305, 108 A. 884 (1919), the Court, quoting from the then-current edition of *Words & Phrases*, observed that "the term 'evidence' is the more comprehensive word and includes testimony which latter strictly speaking means only the evidence which comes from living witnesses who testify orally, but in common language the two words are frequently used synonymously." Whether "testimony" is to be given this extended meaning depends on the context of its use. In *Zipus*, the question arose in the context of a jury instruction defining the burden of proof as preponderance of the "testimony," and the Court had no difficulty in concluding that the word "testimony," as so used, meant the same as "evidence."

The context here is quite different. As noted, the Legislature, in 1993, carefully used the word "evidence" everywhere but in this one subsection dealing with procedural irregularities not appearing on the record. That distinction was in the original adoption of the Administrative Procedure Act in 1957 (1957 Md.Laws, ch. 94, enacting art. 41, § 226, 1957 Md.Code), and it has remained in the law throughout several amendments and recodifications. It is in sharp distinction to the wording of the 1961 revised Model State Administrative Procedure Act proposed by the Uniform Law Commissioners

which, in § 15(f) provided that, "[i]n cases of alleged irregularities in procedure before the agency, not shown in the record, *proof* thereon may be taken in the court." (Emphasis added.) *See* also § 5–114 of the 1981 version of the Model Act, permitting the court to "receive evidence" in similar circumstances.

Unlike the situation in *Zipus,* this analysis convinces us that the Legislature intended § 10–222(g)(2) to allow only "testimony" in its more narrow sense of oral evidence. The documents at issue do not qualify as "testimony" in that restricted sense; § 10–222(g)(2) therefore has no application.

Apart from that, and despite the argument of St. Agnes to the contrary, there is no indication of any irregularities in procedure before the agency not appearing on the record. Maryland General and St. Agnes requested Dr. Estes and the Commission to obtain and consider this very evidence. Those requests and their denial were in the agency record; to the extent, therefore, that the denials could, in any sense, be regarded as an irregularity in procedure, the irregularity appeared on the record and no testimony was necessary to establish it. Most conclusively, however, we do not regard as a *procedural irregularity* the Commission's decision not to reopen the record a second time to permit new discovery in an effort to turn up further evidence to impeach a witness who had already been twice subjected to cross-examination.

### Section 10–222(f)(2)

■ Union Memorial's evidence with respect to the financial viability of its proposal, and, in particular, Genuine Issues 12, 13, and 15, came principally from the pre-filed written testimony of its Vice–President and Chief Financial Officer, Edward J. Kelly, III. That testimony, in written question-and-answer form, was filed with the Commission on May 29, 1992, prior to the preparation of the hospital's FY 1992 audited financial statements.

In his pre-filed testimony, Mr. Kelly recited the hospital's "internal financial forecasts" of net income as follows: for FY

1992, $2.536 million; for FY 1993, $2.473 million; for FY 1994, $3.682 million; for FY 1995, $3.552 million; and for FY 1996, $3.787 million. He noted that, as the result of more recent events, including a one-time charge against income of $3,000,-000 for bad debt write-off, net income for FY 1992 was expected to be $1.5 million, rather than the $2.535 million estimated earlier.

Kelly reported that the hospital had reached an agreement with the Health Services Cost Review Commission for a 4.35% spend-down and, in that regard, noted that, while the Cost Review Commission regression formula for bad debts predicted a decrease in bad debt for the hospital, in fact, bad debt was increasing. In explanation of the $3,000,000 bad debt write-off, Kelly said that, in 1990, the hospital had contracted out its entire outpatient billing and collection functions and that the contractor had performed at a lower rate than anticipated. Those functions had been returned to the hospital in January, 1992, but, in the meanwhile, the hospital was faced with charging-off $3,000,000 in billings that were initially thought to be collectible.

At the actual hearing in July, 1992, Mr. Kelly was cross-examined on some of his pre-filed testimony. Although cautioning that the books still had not been closed for FY 1992, he confirmed his prediction that the hospital would earn $1.5 million for that year, after taking into account the $3,000,000 one-time charge for bad debts. He stated explicitly that, notwithstanding a pending investigation of the circumstances under which the accounts receivable were assigned to an outside agency, he did not expect the charge against 1992 income to exceed $3,000,000.

As we indicated, on November 9, 1992, Maryland General filed a motion to reopen the record to admit "information of material changes in the financial projections of [Union Memorial]." The movant noted that, during the week of October 26, 1992, Union Memorial had filed with the Health Services Cost Review Commission its audited financial statements for FY 1991 and 1992, along with a request for retroactive rate relief.

Maryland General asserted that there were material differences between the recently filed financial statements and the financial projections presented by Union Memorial during the proceeding, and it asked Dr. Estes to reopen the record to take official notice of those material changes.

In an accompanying memorandum, Maryland General pointed out that, in contrast to the testimony that Union Memorial would achieve a net income of $1,500,000 for FY 1992, the audited statement showed a negative net income of nearly $2.9 million. It contended as well that the request for a 2% Guaranteed Inpatient Revenue (GIR) adjustment retroactive to May, 1992, would directly affect the hospital's current and future rates, including those for its OHS/PTCA program. St. Agnes joined in Maryland General's motion.

As an initial response to the motion, Dr. Estes asked John Colmers, Executive Director of the Health Services Cost Review Commission, to review the motion and the responses received to it and to evaluate the impact of Union Memorial's requested rate increase on its CON application. Colmers was asked to respond to three specific questions, including whether the requested rate increase would cause him to change his testimony regarding the financial viability of Union Memorial. Although a copy of Dr. Estes's letter was sent to counsel for each of the hospitals, neither Maryland General nor St. Agnes asked that the inquiry of Mr. Colmers be enlarged.

On December 10, 1992, Colmers responded to the questions put to him. Most significantly, he reported that the requested rate increase would not cause him to change his testimony.[2] He noted that Union Memorial was experiencing cash flow

---

2. We are unable to locate Mr. Colmers's testimony in the record extract. Dr. Estes summarized, and relied upon, much of it in his proposed opinion. Estes noted, in pertinent part, that Colmers has testified that *all* of the applicants' revenue proposals were capable of being operationally implemented by the Cost Review Commission and that, although Union Memorial's bottom line performance would be negatively affected in 1992 by the hospital's successful implementation of its spend-down agreement, this was a "temporary phenomen[on]," and its loss of revenue would be made up the next year.

shortfalls because it was appropriately responding to the conditions of the spend-down agreement with the Cost Review Commission to reduce lengths of stay. He said that the hospital would recover some of that lost revenue through GIR rewards the following year and that it had simply requested an advance on that reward that it had already earned. Colmers concluded: "As I stated during cross examination, I am not concerned with Union Memorial's financial ability to meet, at a minimum, the rate reduction offer made in its application."

Following receipt of Colmers's letter, Dr. Estes reopened the record to admit the various documents he had received and scheduled another hearing for cross-examination of Mr. Colmers and for Mr. Kelly to explain the discrepancies between his earlier testimony and the audited 1992 statement. Mr. Colmers stated that he had made no additional investigation beyond the effect of the retroactive GIR adjustment on Union Memorial, which is all that he had been asked to do. He confirmed that, apart from the one-time adjustments, Union Memorial's financial condition was not materially different.

A number of adjustments accounted for the difference between the $1.5 million income estimated by Kelly in July and the $2.4 million loss reflected on the audited statement. Much of it arose from an extraordinary loss in receivables that was explained in Note 2 to the FY 1992 income and expense statement. Note 2 stated that the initial allowance for doubtful accounts was based on historical trends of collection rates, but that, once all billing and collection activities were returned to the hospital, management found that the historical trends did not appropriately consider the condition of the current receivables. The estimated impact was $5.1 million, which was recorded as a $3.9 million increase in bad debt expense and a $1.2 million decrease in patient revenue for FY 1992. The auditors also insisted on a switch of $884,000 from capitalized interest to interest expense.

Kelly had initially estimated the bad debt impact to be no more than $3 million; he had said nothing about the increase in interest expense. Maryland General and St. Agnes were anxious to know when he first discovered these and other additional charges. More than implicit in the cross-examination was the suggestion that Mr. Kelly had known about them earlier, that he had deliberately concealed the differences, and that he had misled the Commission as to Union Memorial's financial condition. Kelly repeatedly responded that he did not become aware of the need for these charges until September, when he received a preliminary audit from Ernst & Young. He said that he had verified the auditor's information in late September.

Maryland General asked Kelly to provide the dates he received the draft audits, and he agreed to do so, if they could be located. On February 17, 1993, counsel for Union Memorial informed Dr. Estes that it was not the practice of Ernst & Young to retain preliminary drafts and that none could be located at that firm. She reported that Mr. Kelly had located drafts dated September 30 and October 12, 1992.

Even before that response was received, St. Agnes, on February 16, complained that the request made of Mr. Kelly for preliminary drafts was too narrow. It asked Dr. Estes to request from Ernst & Young the dates contained in their "working papers" reflecting communications with Union Memorial regarding the 1992 audit adjustments. On February 19, Maryland General proposed a far more extensive list of questions to be asked of Ernst & Young, including when and under what circumstances that firm first became aware of the various issues or adjustments and when it first informed Union Memorial. Union Memorial objected that such inquiries (1) went beyond the purpose of the February hearing, which was simply to determine the effect of the 1992 loss and the requested rate adjustment on Union Memorial's financial viability, and (2) those questions could have been raised at the February hearing.

Dr. Estes rejected the requests from St. Agnes and Maryland General. In a letter dated March 3, 1993, he concluded that Union Memorial's response complied with the request made at the February 8 hearing, that all parties had an opportunity at that hearing to cross-examine Mr. Kelly, and that he (Estes) had sufficient information to evaluate the issues raised in the reopened hearing. Not content, Maryland General moved for reconsideration, pointing out, for the first time, that Mr. Kelly's testimony was inconsistent with statements he had made to *Maryland General* management representatives in *May, 1992.* That motion was denied, Dr. Estes noting that Maryland General was obviously aware of such alleged inconsistent statements long before the record was closed, and indeed even before the hearings commenced. He iterated that he had sufficient evidence in the record to allow him to make a decision. As we indicated earlier, Dr. Estes and the Commission ultimately concluded that there had been no deliberate attempt to mislead the Commission, that there may have been miscalculations or oversights on Kelly's part, but that there was no basis to believe that they would continue in the future, and that Union Memorial was financially viable and the OHS/PTCA program was financially feasible.

The attack on Mr. Kelly by Maryland General has become even more strident. The claim that he knew about but concealed some or all of the adjustments and thus deliberately misled the Commission is no longer veiled. Maryland General, in its brief, speaks at least twice of his "mendacity" as though it had been established. St. Agnes urges that production of the evidence it belatedly demanded would establish knowing falsity on Kelly's part. The argument, which has been raised to due process dimensions, is that, by refusing to allow new discovery and reopen the hearing a second time for new evidence, the Commission denied appellants a fair opportunity to demonstrate that Union Memorial was not deserving of or entitled to the CON.

We find these attacks regrettable, inappropriate, and properly rejected by the Commission and the circuit court. We do not know when Mr. Kelly first discovered that substantial

adjustments needed to be made to the FY 1992 projection, or when he first knew or suspected that the testimony he gave in May and July was not accurate. The point is that (1) the Commission was aware of the true state of Union Memorial's financial situation before it rendered its decision and nonetheless found, *upon substantial evidence,* that the hospital was financially viable, (2) the Commission, through Dr. Estes, had an opportunity to hear both the challenge to Mr. Kelly and his response, and it made a credibility determination in Kelly's favor, which it had a right to do, and (3) challenges to evidence and the credibility of witnesses must end some time.

Certainly, this Court does not condone the deliberate misrepresentation of facts presented to an adjudicatory body, but, despite a fair opportunity to expose such misrepresentation on Mr. Kelly's part, appellants failed to convince the Commission that it had occurred. To drag the matter on, after the record has been closed for the second time, by insisting on new discovery that necessarily would lead to even further hearings or the consideration of information known by the party nearly nine months earlier is simply inappropriate. Dr. Estes and the Commission decided, twice, that they had enough information from the record to make a decision. The circuit court did not err in accepting that decision.

### APPROVAL POLICY (8)

■ Maryland General complains that despite "clear evidence" favoring it and only "scant evidence" favoring Union Memorial, the Commission failed to award Maryland General a preference under Approval Policy (8). The very statement of the complaint exposes its weakness. It is not for the court to determine what evidence the Commission should credit or to assess the relative strength of the evidence. As we indicated above, the Commission made a number of subordinate determinations with respect to Approval Policy (8), some of which indeed went strongly in Maryland General's favor. Others, however, went in favor of St. Agnes or Union Memorial. The ultimate conclusion that, on balance, there was insufficient evidence to give any applicant preference under Approv-

al Policy (8) is quintessentially a judgment call invoking the expertise of the Commission. It is clearly not, as Maryland General contends, an issue of law upon which the court may substitute its judgment for that of the agency.

## APPROVAL POLICY (7)

■ Maryland General complains that the Commission "disregarded the plain language of Approval Policy 7, which requires a *balancing* of effectiveness and costs" and instead "placed an unjustifiably narrow and highly subjective emphasis on 'program effectiveness' and largely disregarded objective and quantifiable considerations of 'cost' because [Maryland General] would prevail in any evenly balanced assessment."

This complaint is not only unsupported by the record but ignores the appropriate standard of judicial review. As documented in an earlier part of this Opinion, Dr. Estes and the Commission did not ignore the requirement that program effectiveness and cost be balanced. Dr. Estes devoted considerable attention to both aspects of the Approval Policy; he, and the Commission, found that all applicants satisfied the "cost" prong but that Union Memorial was entitled to the preference because it offered a more effective program. There was substantial evidence in the record to support both findings. The actual balancing of these considerations is judgmental, invoking the expertise of the agency; it is not a matter for second-guessing by a court.

## SUBSTANTIAL EVIDENCE; ARTICULATION OF REASONING

■ We turn now to St. Agnes's complaint that the Commission "failed to find facts and articulate its reasoning to support its conclusion that Union Memorial's proposal is financially viable." It asserts, first, that the Commission "merely made a finding as to the *ultimate fact* of financial viability without delineating the facts and articulating the reasoning to support that conclusion." This, in turn, seems to be based on the proposition that Union Memorial's projections for fiscal

years 1993, 1994, and 1995 were based on its projection for 1992, and that the Commission failed to require new projections once it became clear that the 1992 projection was incorrect. It complains, in this regard, that the Commission wrongfully inferred from Mr. Colmer's statement that he did not perform a new analysis that a new analysis was not necessary.

What all of this overlooks is the unrebutted testimony from both Mr. Colmers and Mr. Kelly that the major adjustments made to Union Memorial's 1992 income and expense, which converted the estimated $1.5 million gain into a $2.4 million loss, were one-time, non-recurring charges, and that they would not affect the hospital's future financial viability. St. Agnes argues that the loss sustained in 1992 *would* affect Union Memorial's future viability, but it offered no evidence to support that argument. There was substantial evidence before the Commission that the loss sustained in 1992 would *not* have such an effect, and the Commission was entitled to credit that evidence, as, indeed, it did. The Commission did not "merely make a finding as to the ultimate fact." It discussed in some detail the effect of the 1992 loss, but simply came to a different conclusion than St. Agnes.

■ St. Agnes's second complaint, in this regard, has to do with Union Memorial's Intensive Care Unit (ICU) nursing staff ratio. One of the standards included in the State Health Plan, which St. Agnes identifies as COMAR 10.24.17.06(B)(8) but which does not appear in COMAR at all, requires an applicant to document its ability to recruit and retain an adequate number of nurses to staff the proposed number of ICU beds at a staffing ratio of at least one nurse per patient bed per shift for the first 24 hours of the patient's stay in the ICU and one nurse per two patients per shift for the remainder of the patient's stay.

It appears that, in estimating the cost of ICU nurses necessary for the OHS unit, Union Memorial used "paid hours" as the measurement. In pre-filed testimony, Rhonda Anderson, a St. Agnes vice-president and controller, pointed

out that, because of vacations and other non-productive hours, it was necessary to estimate cost based on "worked hours," rather than "paid hours," and that, as a result, in Years 2 and 3, Union Memorial would be "short" between one-quarter and one-third of a full-time equivalent (FTE) ICU nurse.

The Commission agreed with Ms. Anderson that "paid hours" had to be converted to "worked hours" in order to determine whether the applicants met the required staffing ratio. It concluded, however, that it may be appropriate to include nurse FTEs of the PTCA manpower projection in the calculation, and that, if that were done, Union Memorial would satisfy the staffing ratio. St. Agnes argues that this allowance is "contrary to the evidence of record"—that Union Memorial's application indicates that the OHS and PTCA units would be physically separate and that the OHS units could not, therefore, borrow nurses from the PTCA unit. "[T]here is no evidence," St. Agnes asserts, "to support the Commission's finding that Union Memorial satisfied the nursing staffing ratio for the OHS ICU."

That is not the case. The Commission's finding that Union Memorial would be able to borrow from the PTCA unit came from the staff report, which is in the record. That aspect of the report, in turn, was supported by the testimony of Pamela Potter who, according to the Commission, was a qualified expert in health planning. Ms. Potter explained that some PTCA procedures are unsuccessful, and the patient, admitted to the PTCA unit, must undergo open heart surgery. Some part of the patient's first day, therefore, is actually in the PTCA unit. There was further evidence that the OHS nurse supervisor could also provide patient care, so some of her time could be counted. In summary, there was evidence supporting the Commission's determination that Union Memorial met the required nurse staffing ratio.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.