709 A.2d 749

CATONSVILLE NURSING HOME, INC. et al.

v.

Aurelia LOVEMAN, Guardian for the
Estate of Joseph Loveman.

No. 100, Sept. Term, 1997.

Court of Appeals of Maryland.

May 15, 1998.

Paul D. Raschke (Catherine C. Hester, Bouland, Gisriel & Brush, L.L.C., on brief), Baltimore, and Margaret Ann Nolan, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., C. Frederick Ryland, Asst. Atty. Gen., on brief), Baltimore, for appellants.

Kurt J. Fischer (Marta D. Harting, Tilghman E. Price, Piper & Marbury, L.L.P., on brief), Baltimore, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASNOW, RAKER, WILNER and CATHELL, JJ.

CATHELL, Judge.

Catonsville Nursing Home and Maryland Health Resources Planning Commission, appellants, appeal from a reversal by the Circuit Court for Baltimore County of the Maryland Health Resources Planning Commission's decision with respect to the allocation of nursing home "bed rights" as between Catonsville Nursing Home and its landlord, Joseph Loveman. Finding in favor of Aurelia Loveman, Guardian for the Estate of Joseph Loveman, appellee, the circuit court held that an exemption provision for health care projects in existence prior to the 1978 enactment of a comprehensive health planning statute was a right that attached to and ran with the land. Accordingly, the circuit court found that the bed rights in dispute belonged to appellee.

We shall reverse the judgment of the circuit court and remand with direction that it affirm the decision of the Maryland Health Resources Planning Commission.

## I. Facts and Procedural History

Catonsville Nursing Home (CNH) and the Maryland Health Resources Planning Commission (Commission) appeal from the judgment of the Circuit Court for Baltimore County reversing an earlier Commission decision. The Commission had determined that CNH, as the operator and licensee of nursing home services, as opposed to Loveman, as the owner

of the building housing the nursing home operation and CNH's landlord, held the bed rights in question and, accordingly, was the entity with authority to seek Commission approval affecting those bed rights.

This case has a lengthy procedural history and factual background, which were described in a previous appeal to the Court of Special Appeals. *Loveman v. Catonsville Nursing Home,* 114 Md.App. 603, 691 A.2d 693 (1996). There that court stated:

> In 1960, Mr. Loveman opened a 98–bed comprehensive care facility at 333 Harlem Lane, in Baltimore County.... [T]he home was operated through a corporation known as Shangri–La Nursing Center, Inc., in which Loveman owned all the stock.... [H]e was the licensee and he ran the home as an owner-operated facility. In 1978, the Legislature enacted a comprehensive health planning law that, among other things, created a health planning and development agency and provided that a health care facility may not be established, relocated, or undergo a change in bed capacity without a certificate of need (CON) issued by that agency. The law exempted from that requirement ... a health care facility, such as that operated by Mr. Loveman, that was in operation before June 1, 1978. That exemption underlies the instant dispute.
>
> Mr. Loveman operated the home through Shangri–La until 1981, when, as a consequence of his being convicted of medicaid fraud, he was required to surrender his nursing home administrator's license and refrain from participation in the management or operation of a nursing home in Maryland. [In response to that restriction, Loveman leased] the real property and ... personalty used in the operation to one Dexter Case. Case, in turn, assigned his rights to Joseph Kaplan and Benjamin Ashman, who proceeded to operate the home under the name Inglenook Nursing and Convalescent Center [Inglenook]. Both the lease and the assignment were contingent on Kaplan and Ashman obtaining a license to operate the center. That license was issued in September, 1981. [In order to qualify

for that license, Inglenook was issued its own certificate of need.]

In 1987, the Center was acquired by Evergreen Health Group, Inc. In December, 1987, Loveman and Evergreen entered into a new four-year lease for the facility, with a six-year renewal option and an option to purchase. HRPC (the successor agency to the Health Planning and Development Agency) concluded that, as there would be no change in services or bed capacity, the acquisition was exempt from CON review.[1] Evergreen eventually exercised the option to renew. Although it is not clear from the record before us, we assume that Evergreen obtained either a new license to operate the home or an approved assignment of the license that had been issued to Kaplan and Ashman.

In November, 1990, Evergreen assigned its lease to appellee, Catonsville Nursing Home, Inc. (CNH). Included in the assignment was Evergreen's nursing home license, although the assignment was made expressly contingent on (1) approval by the Department of Health and Mental Hygiene of the transfer of the license, and (2) a determination by HRPC that a CON was not required to complete the transaction. As in 1987, the Commission, assured that there would be no change in services or bed capacity, determined that the acquisition was exempt from CON review.

. . . Although not clearly articulated in the briefs or the papers filed below, it is evident that what appellant fears is that, near or upon expiration of the current lease, CNH will seek permission from HRPC to transfer the beds to another location, that the Commission may grant that request by issuing a CON, and that Loveman will then be left in the position of being unable to lease his property to another

---

1. This was pursuant to section 19–115(j)(5)(ii) of the Health–General Article and COMAR 10.24.01.03A, which state that when a person or entity acquires an existing health care facility or service it is exempt, under certain circumstances, from obtaining a new CON. These exemption provisions are not at issue in this case.

licensee unless that licensee obtains a new CON to replace the bed capacity that was moved.[2]

114 Md.App. at 605–07, 691 A.2d at 694–95 (footnote omitted).

On remand from the Court of Special Appeals, the Commission, in its Final Decision on Petition for Declaratory Relief,[3] framed the issue as "which entity—the licensee or the owner of the bricks and mortar of a nursing home—has the right to request Commission approvals regarding that nursing home[?]" The Commission resolved the issue by determining "that CNH as the lessee and operator of the facility—rather than Loveman as the owner of the bricks and mortar—has the right to seek Commission approvals affecting the comprehensive care facility beds currently being operated as Catonsville Community Convalescent Center." Loveman argued to the Commission, to the circuit court, and now to this Court, that the bed rights in question, which are derived from the right to operate a health care project as provided in a CON or exemption, run with the land because the physical facility itself was exempted from obtaining a CON when the new statutory scheme was enacted by Chapter 911 of the Maryland Session Laws of 1978.

The circuit court agreed with Loveman and disagreed with the Commission's finding that the CON and its concomitant bed rights belonged to CNH, stating in part:

When the health planning statute was enacted in 1978 and Shangri–La was permitted by the legislature to continue to

---

**2.** At several points the Court of Special Appeals referred to a transfer of an exemption. To the extent it was referring to the exemption for Loveman and Shangri–La created by the 1978 statute, it was incorrect. Inglenook obtained in 1981, without objection by appellee, a new CON. All of the subsequent transfers related to that CON. Any exemptions from new CON compliance after 1981 referred to subsequent exemptions based on Inglenook's CON and not to the exemption found in Chapter 911 of the Acts of 1978 for health care projects operated by Loveman and Shangri–La.

**3.** COMAR 10.24.01.11 provides that a person can apply to the Commission for a declaration as to the applicability of a statute or regulation to that person's position.

operate beds without a showing of need, that right attached to the land. The ... right so created is analogous to the non-conforming use granted to a gasoline station operating in a residential area before zoning laws....

... [W]hen Loveman surrendered his license to operate a nursing home, only his individual fitness to operate the beds was being impugned. The right to operate beds without further application to the [C]ommission was the expression of the legislature's determination that the geographic distribution of beds existing in 1978 was an appropriate starting point for future planning. Accordingly, this right ran, and continues to run, with the land.

Appellants filed a timely notice of appeal to the Court of Special Appeals. We issued a writ of certiorari prior to that court's consideration of the issues raised. Appellant CNH presents the following questions for our review:

 I. Did the Maryland Health Resources Planning Commission have substantial evidence to support its conclusion that the right to petition the Commission regarding future use of nursing home beds rested with the licensed health care provider, rather than a mere landlord who was forced to terminate providing nursing home care in 1981 due to a medicaid fraud conviction?

 II. Did the circuit court err when it decided, without evidence of such a legislative intent, that nursing home bed rights are a real property interest that "runs with the land," rather than a transferable license or permit?

The Commission presents one question:

Did the Maryland Health Resources Planning Commission correctly determine that the licensed nursing home provider tenant, rather than the landlord who has been precluded since 1981 from providing nursing home care due to a medicaid fraud conviction, controls the right to request future Commission approvals for usage of nursing home beds?

We perceive that the resolution of two questions will resolve all of the questions presented: (1) What is the effect of the

provision of the Laws of Maryland 1978, Chapter 911, which stated that a health care project in operation prior to the effective date of the act was not subject to the act's prohibition against operating a health care project without a CON? (2) What is the effect of appellee's acquiescence in the obtention by Inglenook of a new CON in 1981 and appellee's continued acquiescence since 1981 in the operation of the project pursuant to that CON? Each of these questions are of a legal nature.

## II. DISCUSSION

### A. Standard of Review

Judicial review of an administrative agency's decision is authorized by Maryland Code (1984, 1995 Repl.Vol.), § 10–222 of the State Government Article. Under subsection (h), when exercising such review, the court may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

■ In general,

[a] court's role is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.

*United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994); *Ward v. Department of Pub. Safety & Correctional Servs.,* 339 Md. 343, 347, 663 A.2d 66, 67–68 (1995).

Our review of the agency's factual findings entails only an appraisal and evaluation of the agency's fact finding and not an independent decision on the evidence. *Anderson v. Department of Pub. Safety & Correctional Servs.,* 330 Md. 187, 212, 623 A.2d 198, 210 (1993). This examination seeks to find the substantiality of the evidence. "That is to say, a reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test to the final decisions of an administrative agency...." *Baltimore Lutheran High Sch. Ass'n v. Employment Sec. Admin.,* 302 Md. 649, 662, 490 A.2d 701, 708 (1985); *Anderson,* 330 Md. at 212, 623 A.2d at 210; *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 511–13, 390 A.2d 1119, 1123 (1978). In this context, " '[s]ubstantial evidence,' as the test for reviewing factual findings of administrative agencies, has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[.]' " *Bulluck,* 283 Md. at 512, 390 A.2d at 1123 (quoting *Snowden v. Mayor of Baltimore,* 224 Md. 443, 448, 168 A.2d 390, 392 (1961)).

We have said, "reviewing courts are under no constraint to affirm an agency decision premised solely upon an erroneous conclusion of law." *Insurance Comm'r v. Engelman,* 345 Md. 402, 411, 692 A.2d 474, 479 (1997). Accordingly, we may reverse an administrative decision premised on erroneous legal conclusions. *See People's Counsel v. Maryland Marine Mfg.,* 316 Md. 491, 497, 560 A.2d 32, 34–35 (1989).

We are also obligated to "review the agency's decision in the light most favorable to the agency," since their decisions are *prima facie* correct and carry with them the presumption of validity. *Anderson,* 330 Md. at 213, 623 A.2d at 211; *Bulluck,* 283 Md. at 513, 390 A.2d at 1124.

In the case at hand, the circuit court misconstrued the exemption provision provided in the Health Planning and Development Act.

## B. Statutory Interpretation

The cardinal rule of statutory construction is to ascertain and effectuate the intent of those who framed or adopted the statute. *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995). The intention of the legislature must be sought first in the actual language of the statute. *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997)(quoting *Tidewater v. Mayor of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995); *Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951, 957 (1996); *Romm v. Flax,* 340 Md. 690, 693, 668 A.2d 1, 2 (1995); *Oaks,* 339 Md. at 35, 660 A.2d at 429; *Mauzy v. Hornbeck,* 285 Md. 84, 92–93, 400 A.2d 1091, 1095–96 (1979); *Board of Supervisors of Elections v. Weiss,* 217 Md. 133, 136, 141 A.2d 734, 736 (1958)). A court, in determining legislative intent, must read the language of the statute in context and in relation to all of its provisions and its purpose. *Howard Research & Dev. Corp. v. Concerned Citizens for Columbia Concept,* 297 Md. 357, 364, 466 A.2d 31, 34 (1983). Furthermore, where the statutory language is plain and free from ambiguity and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself. *Marriott Employees,* 346 Md. at 445, 697 A.2d at 458; *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 513, 525 A.2d 628, 632 (1987); *Hunt v. Montgomery County,* 248 Md. 403, 414, 237 A.2d 35, 41 (1968). *See also Brodsky v. Brodsky,* 319 Md. 92, 98, 570 A.2d 1235, 1237 (1990) ("[W]e look first to its language, . . . we assume that the words of the statute are intended to have their natural, ordinary and generally understood meaning in the absence of evidence to the contrary.") (citing *Kaczorowski,* 309 Md. at 513–14, 525 A.2d at 632);

*Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 74–75, 517
A.2d 730, 731–32 (1986).

The Court in *Tucker* opined:

That a term may be free from ambiguity when used in
one context but of doubtful application in another context is
well settled....

....

... We ... recognize the rule that where a statute is
plainly susceptible of more than one meaning and thus
contains an ambiguity, courts consider not only the literal or
usual meaning of the words, but their meaning and effect in
light of the setting, the objectives and purpose of the
enactment.... [T]he court ... may consider the conse-
quences resulting from one meaning rather than another,
and adopt that construction which avoids an illogical or
unreasonable result, or one which is inconsistent with com-
mon sense.

*Id.* at 74–75, 517 A.2d at 732 (citations omitted).

We stated in *D & Y, Inc. v. Winston,* 320 Md. 534, 538, 578
A.2d 1177, 1179 (1990) (citations omitted), that "construction of
a statute which is unreasonable, illogical, unjust, or inconsis-
tent with common sense should be avoided." *See also Blan-
don v. State,* 304 Md. 316, 319, 498 A.2d 1195, 1196 (1985)
("[R]ules of statutory construction require us to avoid constru-
ing a statute in a way which would lead to absurd results.");
*Erwin & Shafer, Inc. v. Pabst Brewing Co.,* 304 Md. 302, 311,
498 A.2d 1188, 1192 (1985) ("A court must shun a construction
of a statute which will lead to absurd consequences."); *Comp-
troller v. Fairchild Indus.,* 303 Md. 280, 284, 493 A.2d 341, 343
(1985) ("A statute should not be construed by forced or subtle
interpretations.").

Where there is a "lack of relevant legislative history,
we must rely substantially on the language of the statutes *in
the context of the goals and objectives they seek to achieve."
Subsequent Injury Fund v. Teneyck,* 317 Md. 626, 632, 566
A.2d 94, 97 (1989)(citing *Kaczorowski,* 309 Md. at 512–16, 525
A.2d at 632–33)(emphasis added).

### III. Analysis

#### A. Statutory Scheme

This case addresses an issue of first impression in Maryland of whether the exemption from obtaining a CON runs with the land or terminates when the party exempted ceases to use the health care project as a health care project. Accordingly, we must examine Maryland's Health Planning and Development Act. Because it was derived from federal provisions, we begin our discussion with federal legislative background.

The United States Congress, in an attempt to curb the rising costs of health care across the country, passed the National Health Planning and Resources Development Act of 1974, Pub.L. No. 93–641, 88 Stat. 2225 (1975) (codified at 42 U.S.C. § 300–k–300n–6 (1982)), *amended by* Health Planning and Resources Development Amendments of 1979, Pub.L. No. 96–79, §§ 1–129, 93 Stat. 592 (codified at 42 U.S.C. §§ 300k–300t (1976 & Supp. V 1981)), *repealed by* Pub.L. No. 99–660 § 701, 100 Stat. 3743, 3799 (1986)(Federal Act). This act provided substantial federal funding conditioned on a state's enactment of certain health care planning laws. As relevant to this opinion, the Federal Act required states to implement a state health plan (SHP) and administer a CON program for "new institutional health services proposed to be offered or developed within the State." § 1523(a)(4)(B), 88 Stat. at 2246. The purpose of the CON requirement was to add "teeth" to the Federal Act and to help Congress achieve its goals of limiting skyrocketing health care costs, preventing unnecessary duplication of health facilities and resources, and fostering equal access to quality health care for a reasonable cost. Patrick McGinley, *Beyond Health Care Reform: Reconsidering Certificate of Need Laws in a "Managed Competition" System,* 23 FLA. ST. U.L. REV. 141, 148 (1995). Congress repealed the CON requirements in 1986, apparently because it was "counterproductive for reforming health care." *Id.* Many states, however, including Maryland, retained their CON laws.

In 1975, the Maryland General Assembly authorized the Governor to implement provisions of the Federal Act. 1975 Md. Laws, Chap. 383. In 1978, the General Assembly, finding that it was a priority of the State to assure equal financial and geographic access to quality health care for all citizens at a reasonable cost, created the Maryland Health Planning and Development Agency and the Maryland Health Resources Planning Commission to carry out the federal and state legislation. 1978 Md. Laws, Chap. 911. *See also* § 19–102(a). This bill was codified as Maryland's Health Planning and Development Act and implemented the laws and the procedures for obtaining a CON.

Chapter 911 provided an exemption provision from CON requirements for health care projects in existence prior to 1978. The exemption provision stated in pertinent part:

59J. Certificate of Need.

(A) (1) A person or health care facility may not develop, operate, or participate in a health care *project* unless the state agency has issued a certificate of need for the *project.*

(2) This subsection does not apply to a health care *project* which:

(I) was not subject to Certificate of Conformance Review as required by Chapter 222 of the Acts of 1968; and

(II) was completed and in operation on or before June 1, 1978. [Emphasis added.]

Accordingly, those health care projects in operation before June 1, 1978 were exempt from the process of obtaining a CON. The projects were not exempt from other statutory requirements.

Although this Court has not reviewed in great depth the CON exemption provision of the Health Planning and Development Act, we have had occasion to review the Act's purpose. We said in *Sinai Hospital v. Maryland Health Resources Planning Commission,* 306 Md. 472, 473, 509 A.2d 1202, 1202 (1986), that under the comprehensive health care statutory framework "[a] priority of this State is 'to promote the development of a health care system that provides, for all citizens,

financial and geographic access to quality health care at a reasonable cost.'" *See also* § 19–102. The Court of Special Appeals has said that the Federal Act upon which Maryland's CON laws are based "encouraged states to look at the problems of costly maldistribution and excess supply of certain health services and facilities." *Doctors' Hospital v. Maryland Health Resources Planning Comm'n,* 65 Md.App. 656, 662, 501 A.2d 1324, 1327 (1986).

Maryland's goals were refined and put into effect by the Commission in the SHP. By statute, the Commission must develop and adopt, at least every five years, an SHP. The SHP must include:

(i) A description of the components that should comprise the health care system;

(ii) The goals and policies for Maryland's health care system;

(iii) Identification of unmet needs, excess services, minimum access criteria, and services to be regionalized;

(iv) An assessment of the financial resources required and available for the health care system;

(v) The methodologies, standards, and criteria for certificate of need review; and

(vi) Priority for conversion of acute capacity to alternative uses where appropriate.

§ 19–114(a)(2). In addition, the Commission must adopt "specifications for the development of local health plans and their coordination with the State health plan." § 19–114(b). With respect to the SHP, the Court of Special Appeals, repeating our language from *Sinai,* stated that its purpose "is to establish an integrated system of care that 'assures geographic and financial access to a range of quality health care services at a reasonable cost for all citizens.'" *Changing Point, Inc. v. Maryland Health Resources Planning Comm'n,* 87 Md.App. 150, 155, 589 A.2d 502, 504 (1991) (quoting CO-MAR 10.24.14.02A).

A CON must be issued consistent with the goals of the SHP. § 19–118(c)(1). With regard to the CON provisions, the

United States District Court for the District of Maryland has noted recently that "the CON requirement serves 'to assure an efficient and effective health care system for Maryland....'" *United States v. Community Home Health,* 984 F.Supp. 374, 381 (D.Md.1997) (quoting *Maryland Gen. Hosp. v. Maryland Health Resources Planning Comm'n,* 103 Md. App. 525, 528, 653 A.2d 1029, 1031, *cert. denied,* 339 Md. 355, 663 A.2d 72 (1995)). Accordingly, the CON requirements are the "teeth" of Maryland's Health Planning and Development Act.

## B. Exemption Clause as a Privilege

 As we noted, *supra,* section 59J of Chapter 911 provided that a person or health care entity, which included the nursing home then operated by Loveman, could not develop, operate, or participate in a health care project unless the state agency issued a CON for the *project.* 1978 Md. Laws, Chap. 911, § 59J(A)(1). The bill also provided, however, that the CON requirement provision did not apply to a health care project which "was completed and in operation on or before June 1, 1978." *Id.* at 59J(A)(2)(II). Therefore, Loveman's health care project, the nursing home services he provided at the facility on 333 Harlem Lane, was not automatically granted a CON. The project was, to the extent of its operations as of June 1, 1978, exempted *from the requirement to then obtain a CON.* Our task in this case, therefore, is to interpret this exemption and what the General Assembly intended by allowing health care projects in existence at the time of the statute's enactment to be exempt from obtaining an otherwise mandatory CON. This is an issue of statutory construction and a question of law.

Nowhere in section 59J of Chapter 911 did the legislature use the word "exempt." Instead, the provision stated that "this subsection does not apply to health care projects already operating by June 1, 1978." The effect of this subsection, however, was to "exempt" those facilities from the requirement to obtain a CON.

BLACK'S LAW DICTIONARY 571 (6th ed.1990), as relative to the case at bar, defines exemption as: "Freedom from a general duty or service; immunity from a general burden." THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 499 (Unabridged ed.1983) defines exemption as "the act of exempting," "the state of being exempted; immunity." It defines exempt as "to free from an obligation or liability to which others are subject." These definitions, although not particularly enlightening, do indicate that exemptions typically relieve someone or something of an otherwise mandatory obligation. This definition appears logical and consistent with the statute in that those health care projects in existence prior to June 1, 1978, were relieved of the burden of then obtaining a CON in order to qualify for a license to continue services already provided by the project at that time, whereas new projects were required to obtain a CON from the outset.

Maryland cases addressing exemptions are very limited. Some relate to creditor/debtor actions and statutory exemptions of certain property from execution or other similarly related areas of law. In any of those circumstances, however, the exemptions can be waived. For example, in *Lawrence v. Commercial Banking Corp.,* 165 Md. 559, 169 A. 69 (1933), this Court stated relative to a creditor/debtor action: "The statute was not, we think, intended to have the effect of preventing the . . . employee from waiving the advantages accruing to him thereunder." *Id.* at 562, 169 A. at 70.

*Green v. State,* 59 Md. 123 (1882), involved a statutory exemption from the requirement that a person sit on jury duty. That statute provided that "all persons over seventy years of age . . . shall be exempt from attendance as jurors." *Id.* at 125. Green had been indicted by a grand jury and convicted by a petit jury of forgery and sought to challenge his conviction because each jury had persons over seventy years of age serving. We disagreed with Green, holding that the exemption was a privilege capable of waiver. We said:

[A]nd in exempting persons over 70, the law makes a concession of immunity to them in view of their age, and relieves them from duties so long borne and discharged. . . .

They are *exempted* only—that is they are competent but not compellable. The Act of 1858, ch. 139, first exempted persons over 70. It says "they are hereby exempted and relieved from serving as jurors in all cases." The codifiers have omitted all after the word exempted. The omitted words show most clearly *that it was a personal privilege which was accorded,*—relief from the duty, if they chose to avail themselves of it. Webster says, "exemption" is "immunity," "a privilege," and illustrates by applying it to military and jury service: "as exemption from military or jury service."

*Id.* at 128 (some emphasis added).

There is little other case law in Maryland or elsewhere construing exemptions in other situations. Some jurisdictions that have addressed exemptions have referred to "exemptions" as personal privileges that can be waived. *See, e.g., State v. Stunkle,* 41 Kan. 456, 459, 21 P. 675, 676 (1889) ("Exemption is the personal privilege of the party exempted. . . . [T]he exempt person may . . . waive the privilege conferred by law."); *Pugh v. St. Louis Police Relief Ass'n,* 237 Mo.App. 922, 938, 179 S.W.2d 927, 936 (1944)("Exemption is a personal privilege."). *Accord Rusk v. Rusk,* 859 S.W.2d 751 (Mo.Ct.App.1993). *See also State v. Exxon Corp.,* 676 So.2d 783, 786 (La.Ct.App.1996) ("An exemption implies a release from some burden, duty or obligation."(citation omitted)).

 We conclude, accordingly, that an exemption in this context generally is personal to the person or entity exempted. In this case, the entity that held the exemption was the health care project and the party operating that health care project: Shangri–La and Loveman, respectively. Like most personal privileges, the exemption can be waived. To the extent the exemption is related to *real property,* and we do not hold that it is, the exemption would remain a privilege, an incorporeal hereditament that also can be waived and abandoned, as we shall later explain.

There is little or no reference to these exemption provisions in the legislative history of either the original Maryland or

Federal Acts. Additionally, our courts have yet to construe this exemption clause. Other states, however, have addressed tangentially the issue and have held that such an exemption provision must be narrowly construed. For instance, the Supreme Court of Georgia construed a similar exemption from the CON requirement under its State Health Planning Act. In *Phoebe Putney Memorial Hospital v. Roach,* 267 Ga. 619, 480 S.E.2d 595 (1997), that court was called upon to examine "whether a mobile cardiac catheterization unit which was . . . exempt from obtaining a certificate of need when it began operating in Vidalia, Georgia, must obtain a certificate of need in order to operate in Albany, Georgia." *Id.* at 619, 480 S.E.2d at 596. Answering in the affirmative, the court noted first that although the statute exempted from CON requirements projects in existence prior to the enactment of the State Health Planning Act, the statute provided no exemption for such projects to relocate without first obtaining a CON. The court then went on: "The exemption provisions of this statute must be followed closely; deviations are not permitted. *See Chattahoochee Valley Home Health Care, Inc. v. Healthmaster, Inc.,* 191 Ga.App. 42, 44, 381 S.E.2d 56 (1989)[, *cert. denied,* 493 U.S. 1079, 110 S.Ct. 1132, 107 L.Ed.2d 1037 (1990)]. Thus, in the absence of an express provision authorizing an exemption for the relocation of [the health care project at issue, that project] must obtain a CON if it is relocated." *Id.* at 620–21, 480 S.E.2d at 597. *See also Seashore Ambulatory Surgery Center, Inc. v. Dep't of Health,* 288 N.J.Super. 87, 101, 671 A.2d 1088, 1095 (1996) (holding that the clear language of the act providing that a CON was needed for new health care project limited the exemption clause from applying to other situations not specified in the clause).

When Loveman's license was revoked permanently, he ceased operating the nursing home and removed its personalty. Later, he and the corporation attempted to salvage their investment by leasing the existing building at 333 Harlem Lane to other nursing home health care projects. Eventually, Inglenook became licensed and operated its own, new project.

It obtained an emergency CON and then a permanent CON to operate its nursing home. We found no indication from the record, nor do the parties point us to such an instance, of appellee objecting to the grant of the new CON to Inglenook. Thus, Inglenook and the subsequent operators at that location conducted their business under the aegis of Inglenook's newly acquired CON, not the prior exemption provided to Loveman and Shangri–La under Chapter 911. Subsequent health care projects and the "chain" of operations can be traced back to the Inglenook CON. Loveman and Shangri–La's medicaid convictions, the loss of Loveman's license to operate, and his acquiescence as to the issuance of a CON to another operator for the lessee's own health care project, constituted a waiver and abandonment of his exemption privilege.

### C. The Exemption is not a Real Property Interest

CONs now, and in 1978, are issued for "health care projects." 1978 Md. Laws, Chap. 911; § 19–101(c). As we have discussed, the health care project known in 1978 as Shangri–La Nursing Home was then exempt from obtaining a CON. Nonetheless, the project was dependant upon a license for operation. Shangri–La was exempt from the requirement of possessing a CON in order to qualify properly as a potential licensee.[4] Nothing in Chapter 911, however, excused Shangri–La or Loveman from the necessity of complying with all of the other myriad of requirements and regulations governing the operation of health care projects. Nothing in Chapter 911 or its current codification prohibited the termination of the operation of the project if, once exempted, it thereafter engaged in egregious conduct not conducive to the well-being of its patients and contrary to the SHP. Furthermore, nothing in the

---

4. Section 19–319(c)(1) provides in relevant part that "[t]he applicant [for a license] shall have a certificate of need ... for the hospital, residential treatment center, or related institution to be operated." See similar provisions and requirements in effect when Shangri–La was in operation. Md.Code (1957, 1971 Repl.Vol. and 1980 Repl.Vol.), Art. 43, § 559(a–1) (superceded).

Nursing homes are "related institutions" under the provisions of this Act. See § 19–301(l)(1)(i).

CON exemption provision excused Loveman or Shangri–La from the statutory requirement that licensees convicted of medicaid fraud shall have their licenses revoked. *See* § 19–327(a) and Md.Code (1980 Repl.Vol.), Art. 43, §§ 559 and 560 (superceded). In fact, this was what happened.

The argument that Loveman was granted some broad right to retain the CON exemption is premised upon his notions of property law and the contention that the exemption was created to run with the land much like a zoning nonconforming use provision.[5] We disagree. The Health Planning and Development Act is a regulatory scheme. The General Assembly gave the Commission the power to regulate the placement of health care projects, the types of services offered, and the number of persons to be served in an attempt to reduce the number of unused or unuseful projects throughout the State. Accordingly, this statute is regulatory in nature in terms of the distribution of health care services and does not, nor was it intended to, confer any specific real property rights.

 Moreover, if appellee's interest in the health care project was a property right, it was, at best, an incorporeal hereditament. If it was an incorporeal hereditament, it has been abandoned. Although we do not agree that the exemption privilege was the equivalent of a nonconforming use, a concept unique to zoning law, we nonetheless address an important aspect of that particular zoning concept.

In *Dorman v. Mayor of Baltimore,* 187 Md. 678, 51 A.2d 658 (1947), we were concerned with a property owner's assertion that he was entitled to utilize his property as a junk business because he had been operating it as such at the time a zoning prohibition against that use was enacted. Subsequent to the time of the enactment, a fire occurred on the owner's property. After the fire damage and the property

---

5. We expressly do not decide appellee's assertion that a nonconforming use created under the law of zoning would run with the land under the law of real property.

were repaired, the owner did not continue operating the junk business for some period of time.

We first noted that "[t]he question presented is whether this non-conforming use in a second commercial use district had been abandoned by the former owners of the property—or changed by them to a use of a higher classification, viz., a warehouse." *Id.* at 680, 51 A.2d at 659. We then discussed the law of abandonment, as it applied to nonconforming uses under many zoning statutes, stating:

> Abandonment depends upon concurrence of two factors, (a) an intention to abandon and (b) some overt act, or some failure to act, which carries the implication that the owner does not claim or retain any interest in the subject matter. Time is not an essential element, but may be evidence of intention to abandon and may be considered in connection with acts manifesting such an intention.... The right under Paragraph 11 to "continue" a non-conforming use is not a perpetual easement to make a use of one's property detrimental to his neighbors and forbidden to them.... *It is only "to avoid injustice that zoning ordinances generally except existing non-conforming uses. \* \* \* The public effort is not to extend [non-conforming uses ], but rather to permit to exist as long as necessary, and then to require conformity for the future. \* \* \** The mere cessation of the use for a reasonable period does not of itself work an abandonment, but once the abandonment is clearly indicated by intention and action, or failure of action for a sufficient period of time, then the owner has lost his right to the non-conforming use.... Were the law otherwise an owner could keep his property in a non-conforming class forever, which would be entirely contrary to the policy underlying zoning [ordinances]."

*Id.* at 684–85, 51 A.2d at 661 (emphasis added)(brackets in original) (citations omitted).

There is no hard and fast rule in nonconforming use abandonments that intent to abandon must be actually shown when the zoning ordinance or statute utilizes the word "abandon-

ment." In *Canada's Tavern, Inc. v. Glen Echo*, 260 Md. 206, 271 A.2d 664 (1970), it was alleged that intent was required to abandon a nonconforming use under an ordinance providing that a nonconforming use, "once abandoned," could not be reestablished. The ordinance defined abandonment as the "cessation" of the use for six months. Canada's Tavern, the lessee, ceased operations and the lessor could not get the premises back into operation within the six-month period, despite diligent efforts to do so. The trial court held not only was cessation of the use required, but also an "intention to abandon" was required. We disagreed:

> We think the Council . . . intended to align itself with those local governments which have found it desirable to delete the factor of intent in respect of the abandonment, discontinuance or cessation of nonconforming uses rather than continuing to run the gamut of its judicial determination in a successation of infinitely variable factual situations. [Footnote omitted.]

*Id.* at 211, 271 A.2d at 666. *See also Harford County v. McDonough*, 74 Md.App. 119, 124–26, 536 A.2d 724, 726–27 (1988).

Even if we were to determine that the exemption here was in some way akin to a zoning nonconforming use, the appellate courts of this State have looked favorably to the public purpose served by the discontinuance and abandonment of such uses, even, as in *Canada's Tavern*, in the absence of actual intent to abandon. Thus it is clear that nonconforming uses can be lost by abandonment. Other privileges and rights likewise can be lost.

In *Mayor and City Council of Baltimore v. Hettleman*, 183 Md. 204, 212, 37 A.2d 335, 338 (1944), the city had set up a special benefit assessment for planned street improvements. The improvements were not constructed until several years later. Describing the law of abandonment, we stated:

> "Abandonment in law depends upon the concurrence of two, and only two, factors; one an intention to abandon or relinquish; and two, some overt act, or some failure to act,

which carries the implication that the owner neither claims nor retains any interest in the subject-matter of the abandonment. 1 C.J.S., *Abandonment,* [§ 3, p.] 8. Time is 'not an essential element' of abandonment, although the lapse of time may be evidence of an intention to abandon, *Id.* [at §§ 3, 7, pp.] 9, 16, and where it is accompanied by acts manifesting such an intention it may be considered in determining whether there has been an abandonment." *Landay v. Board of Zoning Appeals,* 173 Md. 460, 469, 196 A. 293, 297, 114 A.L.R. 984; *Beyer v. Mayor & City Council of Baltimore City,* 182 Md. 444, 34 A.2d 765.

See also the trademark case of *Sherwood Co. v. Sherwood Distilling Co.,* 177 Md. 455, 462, 9 A.2d 842, 844–45 (1939), and *Cristofani v. Board of Education,* 98 Md.App. 90, 632 A.2d 447 (1993). In *Cristofani,* the Court of Special Appeals discussed at some length the theory of abandonment relating to easements, adverse possession, and prescription. The court noted the distinction between possessory rights in property, *i.e.,* possession based upon title, which runs with the land and cannot be abandoned, and those rights arising out of the possessory interests in the land, which can be abandoned. The court stated:

> *Black's Law Dictionary* 726 (6th ed.1990), defines corporeal and incorporeal hereditaments:
>
> . . . .
>
> *Corporeal hereditament.* Substantial permanent objects which may be inherited. The term "land" will include all such.
>
> *Incorporeal Hereditament.* . . . A right issuing out of a thing corporate (whether real or personal) or concerning or annexed to or exercisable within the same. A right growing out of, or concerning, or annexed to, a corporeal thing, but not the substance of the thing itself.

1 Basil Jones, *Tiffany Real Property* § 4 at 8–9 (3d ed.1939), defines corporeal and incorporeal:

> The only corporeal thing of a "real" character is land, or whatever may be considered as a part thereof. Of incor-

poreal things, Blackstone enumerates, under the name of "incorporeal hereditaments," ten varieties, to wit, advowsons, titles [tithes], commons, ways, offices, dignities, franchises, corodies, annuities and rents. [Footnotes omitted.]

*Cristofani*, 98 Md.App. at 98, 632 A.2d at 450–51 (brackets in original).

1 AM.JUR.2D *Abandonment, Lost, Etc., Property* § 14 (1962) provides: "While a corporal hereditament cannot be the subject of abandonment, easements, franchises and other incorporeal hereditaments may be lost by abandonment...."[6]

To the extent an exemption from statutory requirements is in any way related to realty, it is at best an incorporeal hereditament.

Thus, even if the exemption were associated in some way with the land, the rights acquired under it were susceptible to abandonment. Under the present circumstances, such incorporeal rights, if they existed at all, have been abandoned. When Shangri–La's and Loveman's qualifications to be licensed were voided as a result of the medicaid fraud conviction, the exemption from the CON requirement for licensees became, in essence, irrelevant and the need for the exemption ceased. When Loveman acquiesced in the granting of the CON to Inglenook, he abandoned whatever residue of interest he may have had in the exemption.

Our examination of the legislative history of the statutory scheme in its entirety convinces us that to construe the exemption any other way would lead to absurd results, given what we perceive to be the intent of the legislature to require the Commission to develop a SHP and implement it according to the needs of Maryland's residents. The act contemplates that the Commission will allot bed availability through the

---

6. Although comparable language is not found in the latest second edition of American Jurisprudence, we have not found any contrary language.

administration of the CON program according to the geographic need of Maryland's citizens, while keeping in mind financial access, as well, to the health care projects. The purpose of the exemption was not to remove existing operations completely from regulatory review or the necessity for those operations to meet the other statutory requirements.

If, as appellee argues, the exemption right attaches to the physical building, this would defeat not only the Commission's function, but the Act's purpose. For example, if instead of being required to cease operating nursing homes in this State for his medicaid fraud conditions, Loveman's facility at 333 Harlem Lane was destroyed by wind, flood, fire or other catastrophe, and he did not rebuild it as a nursing home but as a bowling alley, office building, or school, under appellee's argument, he still would retain the right to insist that the bed capacity of the prior nursing home at 333 Harlem Lane not be allotted to other nursing home projects because the exemption runs with the land at issue. Thus, if ten years after Loveman opened the bowling alley, office building, or school, he chose to use the facility again as a nursing home, he could, according to this argument, use the exemption previously granted by the legislature and avoid the necessity of going through CON review. In the meantime, however, ninety-eight "beds" would be unavailable to serve the needs of the community because Loveman chose not to utilize them but did not permit them to be used by other nursing home facilities desirous of and able to provide those services.

For us to find for appellee would divest the Commission of its power to implement the SHP, thwart the intention of the legislature, and effectively grant appellee a monopoly as to ninety-eight beds of needed capacity forever, regardless of whether appellee used them and regardless of the need of the community. This cannot be what the General Assembly intended.

## IV. CONCLUSION

Under the Health Planning and Development Act, the operators of certain health care projects in existence prior to 1978

were excused from the necessity of obtaining a CON in order to qualify for licenses to operate their pre-existing health care projects. The exemption is personal to the person or health care operator that operated the health care project prior to 1978 and, if not waived or abandoned, may continue to apply to the specific health care project so long as it remains in operation. That exemption remains with the project and its operator [7] and does not run with the specific land upon which the project may have operated prior to 1978 or with the "bricks and mortar" of the building itself. Furthermore, the exemption may be waived when the person or operator of the health care project becomes otherwise unqualified to hold a license by reason of criminal convictions for medicaid fraud or other applicable convictions, when he acquiesces in the obtainment of a CON by subsequent operators for the operation of the project, or when he ceases to operate the health care project for a significant period of time. In the case *sub judice,* all these are applicable.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED; CASE REMANDED TO THE CIRCUIT COURT WITH DIRECTION THAT IT AFFIRM THE DECISION OF THE COMMISSION; COSTS TO BE PAID BY APPELLEE.**

---

7. Under the circumstances of this case, we need not resolve the issue of the assignability of the rights created by the exemption, as we hold that Loveman and Shangri–La have abandoned whatever rights they once may have had in the exemption at issue here.