Dear Don S. Hillier
You have requested our opinion as to whether bonds issued on behalf of a hospital by the Maryland Industrial Development Financing Authority ("MIDFA") may be paid and refinanced under the Maryland Hospital Bond Program ("Bond Program"), Annotated Code of Maryland, Article 43C, § 16A.
For the reasons given below, we conclude that the Bond Program is available for bonds issued by MIDFA on behalf of a hospital, assuming that other conditions of the Bond Program are satisfied.
 I The Maryland Hospital Bond Program A. 1984 Task Force on Health Care Cost Containment
The Maryland Hospital Bond Program traces its origin to the December 1984 report of the Governor's Task Force on Health Care Cost Containment ("Task Force").[1] The Task Force was formed to address the rapid escalation of health care costs in the early 1980's. The Task Force identified excess hospital capacity as a major factor in rising health care costs in that excess capacity "creates an artificial demand that can lead to inappropriate or unnecessary costs." Governor's Task Force on Health Care Cost Containment, Final Report
(December 14, 1984) pp. 36-37. The Task Force ultimately agreed upon 30 recommendations, two-thirds of which required legislative action by the General Assembly.
To eliminate excess hospital capacity and the attendant long term costs, the Task Force suggested that voluntary consolidations, mergers, conversions, and closings be encouraged to reduce excess capacity.Final Report, at pp. 36-48. To that end the Task Force made a number of recommendations, including that the Health Resources Planning Commission ("HRPC") conduct an institution-specific study and develop an institution-specific plan for the State regarding excess hospital capacity. Id. at pp. 40-41. In addition, it recommended that the State create incentives for hospitals to consolidate, convert, or close.Id., pp. 41-42.
The Task Force recognized that closing a hospital would not be a simple matter. A critical issue in many circumstances would be how the outstanding long term indebtedness of the hospital would be repaid. The Task Force Report described the problem:
 The Task Force has concluded that the financial disruptions caused by closure of a hospital should be minimized by protecting the bonded indebtedness of the closing hospital. The Task Force finds that failure to meet net outstanding long term indebtedness could have a serious adverse effect on subsequent bond issues financing health care facilities, and possibly the State of Maryland itself. Obligations of the Maryland Health and Higher Education Facilities Authority, the primary bonding source for Maryland hospitals, are a special concern. A program to insure the timely payment of outstanding long term bonded indebtedness is, therefore, necessary.
Final Report, Recommendation 26, at pp. 44-45. In order to ensure the timely payment of outstanding bonds of a closed hospital, the Task Force recommended that the debt be spread among remaining hospitals.[2] Id. at p. 45. The Task Force included these recommendations in its prescription for legislative action.
B. 1985 Legislation
The General Assembly responded to the various recommendations of the Task Force in legislation enacted during its 1985 session. See
Chapter 109, Laws of Maryland 1985. In particular, in response to Recommendation 26 of the Task Force, that legislation created the Maryland Hospital Bond Program codified in the Annotated Code of Maryland, Article 43C, § 16A.
The stated purposes of the Bond Program are to minimize the financial disruption caused by the closure of a hospital and to preserve the ability of Maryland hospitals to obtain financing through the issuance of tax exempt bonds.[3] See Chapter 109,Preamble, Laws of Maryland 1985; Article 43C, § 16A(b). Accordingly, the Bond Program permits refinancing of a closing hospital's outstanding bond indebtedness and payment of the debt and costs of closure through a fee assessed on all Maryland hospitals. Implementation of the program requires coordination and consultation among the Secretary of Health and Mental Hygiene, the HRPC, the Health Services Cost Review Commission ("HSCRC"), and the Maryland Health and Higher Educational Facilities Authority ("MHHEFA"), the primary State bond issuing authority for hospitals.
The Bond Program provides for the payment and refinancing of a hospital's public indebtedness if certain conditions are met:
 1. The closure of the hospital is in accordance with Md. Ann. Code, Health-General Article ("HG"), § 19-115(1), a process administered by the HRPC;[4]
 2. There are outstanding "public body obligations" issued on behalf of the hospital;
 3. The closure of the hospital is not the result of a merger or consolidation with one or more other hospitals;[5] and
 4. The plan for closure and the related financing plan are acceptable to the Secretary of Health and Mental Hygiene and MHHEFA.
Article 43C, § 16A(c)(1)-(4).
A closing hospital that seeks the benefits of the Bond Program must provide MHHEFA and the HSCRC with a written statement of any outstanding public body obligations issued on behalf of the hospital. Article 43C, § 16A(f). The HSCRC determines whether to provide for payment of the closure costs of the hospital.[6] Article 43C, § 16A(g). MHHEFA then prepares a schedule of payments necessary to meet the public body obligations of the hospital and, following consultation with the issuer of each public body obligation and the HSCRC, prepares a plan to finance, refinance, or otherwise pay those obligations. Article 43C, § 16A(h).
The statute authorizes MHHEFA to issue new bonds or notes to finance the closing costs and the retirement of the eligible public body obligations. Article 43C, § 16A(i). These new debt instruments are payable from fees assessed by the HSCRC or from other available sources.Id., § 16A(i)(2).
After the plan is developed, the HSCRC assesses a fee on all hospitals that it regulates in an amount sufficient to:
 • Pay the principal and interest on any public body obligations, or any bonds or notes issued by MHHEFA to finance or refinance those public body obligations;
 • Pay the costs of closure and any debt instruments issued by MHHEFA to finance those costs.
 • Maintain any reserve required in the resolution, trust agreement, or other financing agreement securing the public body obligations, bonds, or notes;
 • Pay any required financing fees or other similar charges; and
 • Maintain reserves deemed appropriate by MHHEFA to ensure that the amounts collected are sufficient in the event of defaults by other hospitals in paying the fees.
Article 43C, § 16A(j)(1). The amount assessed each hospital is based on the proportion of each hospital's total gross patient revenue to the total gross patient revenue of all hospitals regulated by the HSCRC.Id., § 16A(j)(2). As a result, the amount assessed in each case will differ depending upon the plan developed by MHHEFA, as well as the nature and the extent of the public body indebtedness involved.
The statute provides that the Bond Program does not relieve a closed hospital of its obligations with respect to the payment of public body obligations and that MHHEFA is subrogated to rights of the bondholders against the hospital. The statute also confers on MHHEFA the right to proceed against any guarantees or collateral in order to protect the interests of bondholders. Article 43C, § 16A(k).
 II MIDFA Bonds
A. MIDFA
The Maryland Industrial Development Financing Authority ("MIDFA") was created by the General Assembly in 1965 to relieve unemployment and encourage economic development in Maryland. Chapter 714, Laws of Maryland 1965; Article 83A, § 5-902. MIDFA was established as "a body corporate and politic and a public instrumentality of the State." Article 83A, § 5-904. MIDFA is funded through the State budget as an agency of the Department of Business and Economic Development. It issues bonds to provide financing support for businesses that are located in Maryland or that are considering a move to the State. Md. Ann. Code, Article 41, § 14-101 et seq. MIDFA also insures the principal and interest payments due under various financing arrangements. Md. Ann. Code, Article 83A, § 5-914. The agency consists of nine members, including the Secretary of Business and Economic Development, either the Comptroller or the Treasurer by designation of the Governor, and seven other members appointed by the Secretary with the approval of the Governor. Id., § 5-905. The appointed members serve at the pleasure of the Governor. Id.
B. Liberty Medical Center Financing
In 1989, MIDFA issued bonds on behalf of Liberty Medical Center ("Liberty"), a hospital on the west side of Baltimore City, in the aggregate principal amount of $13.6 million. In 1996, Liberty merged with a nearby hospital operated by Bon Secours Baltimore Health Corporation ("Bon Secours"). Approximately $11.8 million of the bonds issued by MIDFA on behalf of Liberty remain outstanding.
In November 1998, Bon Secours notified the HRPC of its intention to close Liberty Medical Center and requested application of the Bond Program. On February 9, 1999, the HRPC concluded that closure of Liberty was in the public interest and approved the closure pursuant to HG § 19-115(1). The HRPC then formally notified MHHEFA and HSCRC that Liberty's closing satisfied the first condition for application of the Bond Program. This has prompted your question as to whether the Liberty's MIDFA bonds are "public body obligations" that satisfy the second condition for application of the Bond Program.[7]
 III Analysis
A. Public Body Obligation
As noted above, the Bond Program applies to "public body obligations" of hospitals. Under the statute, the term "public body obligation" includes:
 Any bond, note, evidence of an indebtedness, or other obligation of the payment of borrowed money issued by [MHHEFA] or any public body as defined in Article 31, § 9 of the Code, the Mayor and City Council of Baltimore, or any municipal corporation. . . .
Article 43C, § 16A(a)(2)(i) (emphasis added). Bonds that are insured by a municipal bond insurance policy or that were used to finance facilities separate from the hospital itself are not eligible for the Bond Program.[8]
Thus, in defining eligible debt, the statute identifies two issuers by name — MHHEFA and Baltimore City — and two more general categories of issuers — municipal corporations and "public bodies" defined in Article 31, § 9. Since MIDFA is not identified by name and is not a municipal corporation, whether the Bond Program is available in connection with Liberty's closure depends upon whether MIDFA is a "public body" under the definition set forth in Article 31, § 9. That section defines "public body" to mean:
 Any county, public corporation or other political subdivision of this State or any instrumentality or agency of any county, public corporation or other political subdivision of the State, except that said term shall not be construed to include the Mayor and City Council of Baltimore, any municipal corporation subject to the provisions of Article XI-E of the Maryland Constitution, or any housing authority formed pursuant to the provisions of Article 44A of the Code.
Article 31, § 9(a) (emphasis added.) Since MIDFA is not a county or political subdivision, it is a "public body" for purposes of the Bond Program only if it is a "public corporation" for purposes of Article 31, § 9.
B. Public Corporation Under Article 31, § 9
While the statute does not define or list "public corporations," the Court of Appeals has described such an entity as follows:
 The essential difference between a public and a private corporation has long been recognized at common law. A public corporation is an instrumentality of the state, founded and owned by the state in the public interest, supported by public funds, and governed by managers deriving their authority from the state.
Levin v. Sinai Hospital of Baltimore, 186 Md. 174, 178, 46 A.2d 298
(1946). See also Andy's Ice Cream, Inc. v. City of Salisbury,125 Md. App. 125, 143 (1999). MIDFA falls squarely within this description, given that it is as a "body corporate and politic and a public instrumentality of the State," that it is supported by public funds, and that MIDFA members serve at the pleasure of the Governor. However, the context of the term "public corporation" in Article 31, § 9 raises two questions that require further analysis.
1. Relation to Political Subdivisions
First, the phrase "county, public corporation or other political subdivision of this State" in the definition of "public body" in Article 31, § 9 might be construed to mean that only public corporations that are also "political subdivisions of this State" — e.g., municipal corporations — are within the scope of § 9. Assuming that MIDFA is not a "political subdivision of this State" it would not be covered. However, this interpretation would render the term "public corporation" in § 9 meaningless. Section 9 already explicitly includes counties and "other political subdivisions" and explicitly excludes Baltimore City and municipal corporations. Because all political subdivisions of the State are already covered, the term "public corporation" would not have any additional meaning. A cardinal rule of statutory construction is to give all terms meaning and not to render any language of a statute superfluous. Jung v. Southland Corp., 351 Md. 165, 177, 717 A.2d 387
(1998). Moreover, the definition of "public body" was originally included sixty years ago in a part of Article 31 that applied to public securities generally and appears to have been an attempt to encompass virtually all issuers of public securities. See Chapter 630, Laws of Maryland 1939. Accordingly, in our opinion, the term "public corporation" in Article 31, § 9, is not restricted to entities that are also political subdivisions of the State.
2. Application to State Entities
Second, a 1985 revision of Article 31 that restricted application of that article to local government entities might be construed to exclude MIDFA from the definition of "public body" in § 9. In particular, that legislation added the current § 1 of Article 31, which states that, with an exception not pertinent to this opinion, "this Article does not apply to the State or to any of its units or its instrumentalities." Chapter 11, § 4, Laws of Maryland 1985. One might construe that section to exclude MIDFA, an "instrumentality of the State," from the definition of "public body" in § 9. Under that construction, the cross-reference to Article 31, § 9 in the definition of "public body obligations" in the Bond Program statute would incorporate only local government issuers, and MIDFA bonds would not qualify as "public body obligations" eligible for the Bond Program.
Despite its superficial logic, such a conclusion would be at odds with the legislative history and purpose of the Bond Program. When a mechanically logical interpretation of a phrase results in an illogical result:
 We may and often must consider other "external manifestation" or "persuasive evidence," including a bill's title and function paragraphs, amendments that occurred as it passed through the Legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us. . . .
Kaczorowski v. City of Baltimore, 309 Md. 505, 515, 525 A.2d 628, 632-33
(1978). See also Catonsville Nursing v. Loveman, 349 Md. 560, 570,709 A.2d 749 (1998).
When the legislation establishing Bond Program was drafted in early 1985, Article 31 governed the public securities of both State and local entities. At that time, the cross-reference to the definition of "public body" in § 9 encompassed a wide range of bond-issuing public agencies, including State entities such as MIDFA. The amendment of Article 31 during the same legislative session to add the limiting language of § 1 was a product of the code revision process that created the new State Finance and Procurement Article ("SFP"). Essentially, the portions of Article 31 that related to State finance and debt instruments were consolidated in the new article. See Chapter 11, § 4, Laws of Maryland 1985. The new § 1 of Article 31 apparently was designed to clarify that general provisions concerning the public debt of the State and its instrumentalities were being consolidated in the new SFP Article and that Article 31 henceforth would govern debt issued by local government units. Seeid., Revisor's Notes.[9] Absent an "unmistakable" intention to modify the law, changes made in code revision are presumed to be for purposes of clarity rather than substantive change. Blevins v. BaltimoreCounty, 352 Md. 620, 724 A.2d 22 (1999). Nothing in the Revisor's Notes or the legislative history of that bill suggests that, as part of creating the SFP Article, the General Assembly intended to limit the availability of the Bond Program for MIDFA bonds.
Nor is there any reason to believe that the Legislature intended to exclude otherwise eligible MIDFA bonds from the Bond Program. The stated purpose of the Bond Program was to provide for the payment of the bond indebtedness of closed hospitals in order to preserve access to the financial markets for surviving institutions. Article 43C, § 16A(b); Chapter 109, Preamble, Laws of Maryland 1985. While the General Assembly explicitly contemplated that the program would involve bonds issued by MHHEFA, the State entity most likely to issue bonds on behalf of a hospital, it did not limit the program to debt instruments issued by MHHEFA.
The legislative history of the program demonstrates that it was targeted at the public indebtedness of hospitals without specific reference to the identity of the public issuer. The Task Force expressed concern about the ramifications of a "failure to meet net outstanding long term indebtedness" of closing hospitals. Although it referred to MHHEFA as the primary bond issuing source for hospitals, its description of the problem and its prescription of a solution referred to public bonds generally. See Final Report, Recommendation 26, at pp. 44-45. A legislative staff summary of the bills establishing the Bond Program indicated that it was intended to implement Recommendation 26 of the Task Force. See Research Analysis House Bill 1551, prepared for House Environmental Matters Committee at p. 1 (1985). When the bills were considered in the Legislature, the Secretary of Health and Mental Hygiene testified in support of the bill. As a member of the Task Force and a representative of the administration that had proposed the Bond Program, she explained its purpose: "The intent of this is to protect the public credit of the State and its hospitals by providing refinancing of any outstanding public body obligation held by a closed or delicensed hospital." Testimony of Adele Wilzack on SB 655 before Senate Finance Committee atp.2 (February 21, 1985) (emphasis added). It is apparent that neither the proponents of the program nor the Legislature itself made fine distinctions among different potential State issuers of such bonds.
3. Summary
A review of the legislative history of the Bond Program and of Article 31 suggests the following conclusion: By cross-referencing the then broad definition of "public body" in Article 31, the Legislature apparently intended in 1985 that the Bond Program be generally available for public securities issued on behalf of hospitals. We think it unlikely that the General Assembly, by the coincident creation of the SFP Article and the enactment of § 1 of Article 31 as part of code revision, intended to limit indirectly the Bond Program that it created during the same session. Given that the State entity primarily responsible for issuing bonds on behalf of hospitals was explicitly included in the Bond Program statute, it is perhaps unsurprising that the Legislature apparently failed to discern that creation of the SFP Article arguably could affect the application of the Bond Program to hospital bonds issued by a State agency.[10] In our opinion, the Legislature did not have such an intention, and MIDFA should be considered a "public body" for purposes of the Bond Program.
 IV Conclusion
In summary, it is our opinion that the provisions of the Maryland Hospital Bond Program are available for bonds issued by MIDFA on behalf of a hospital. Assuming that all the other criteria necessary to implement the Bond Program have been met, such bonds are subject to the process set forth in that statute.
J. Joseph Curran, Jr.
Attorney General
Stanley Lustman
Assistant Attorney General
Robert N. McDonald
Chief Counsel
Opinions and Advice
[1] The Task Force was convened by Governor Harry Hughes in August 1984 and chaired by Eugene M. Feinblatt, Esquire. Among its members were State legislators, agency officials, business executives, hospital administrators and union representatives.
[2] The Task Force contemplated that this program of spreading debt would apply only to hospital closures that did not result from mergers or consolidations. The Task Force believed that, in the case of a closure resulting from a merger or consolidation, the outstanding debt of the closing facility should be financed through the rates of the surviving facilities. Final Report, at p. 45.
[3] Although the primary purpose of the Bond Program was to preserve financing options for hospitals, the General Assembly also expressed concern that the failure to provide for payment of public indebtedness of hospitals might have an adverse effect on the ability of the State or local subdivisions generally to obtain financing:
 The General Assembly finds that the failure to provide for the payment of public body obligations of a closed or delicensed hospital could have a serious adverse effect on the ability of Mary land health care facilities, and potentially the ability of the State and local governments, to secure subsequent financing through the issuance of tax-exempt bonds.
 The purpose of this section is to preserve the access of Maryland's health care facilities to adequate financing by establishing a program to facilitate the refinancing and payment of public body obligations of a closed or delicensed hospital.
Article 43C, § 16A(b).
[4] Under HG § 19-115(1) a hospital may close without obtaining a certificate of need if the HRPC finds that the proposed closing is in the public interest and consistent with the State health plan or an institution-specific plan developed by the HRPC.
[5] In practice the HRPC has determined whether a hospital closing is the result of a merger.
[6] Closure costs may include expenses of operating the hospital, payments to employees and consultants, legal fees, utilities, debt service and a variety of other expenses. Article 43C, § 16A(a)(1).
[7] You have not asked, and this opinion does not address, whether the closing of Liberty Medical Center satisfies other criteria for application of the Bond Program.
[8] A 1992 amendment of the statute excludes from the definition of "public body obligation":
 [A]ny obligation, or portion of any such obligation, if:
 (a) the principal of and interest on the obligation or such portion thereof is:
 (i) insured by an effective municipal bond insurance policy; and
 (ii) issued on behalf of a hospital that voluntarily closed in accordance with § 19-115(1) of the Health General Article;
 (b) the proceeds of the obligation or such portion thereof were used for the purpose of financing or refinancing a facility or part thereof which is used primarily to provide outpatient services at a location other than the hospital; or
 (c) the proceeds of the obligation or such portion thereof were used to finance or refinance a facility or part thereof which is primarily used by physicians who are not employees of the hospital for the purpose of providing services to non-hospital patients.
Article 43C, § 16A(a)(2)(ii). See Chapter 600, Laws of Maryland 1992. At one time MIDFA provided bond insurance and the State and Baltimore City also provided certain guarantees to support a letter of credit issued by a bank in connection with the MIDFA bonds. However, upon the consolidation of Liberty and Bon Secours in 1996, the MIDFA insurance and guarantees were replaced with a guarantee by Bon Secours itself. Because there is no longer any bond insurance related to Liberty's MIDFA bonds, we do not consider the question whether MIDFA insurance affects eligibility for the Bond Program.
[9] For example, the Revisor's Note following SFP § 8-221 states:
 Most of the sections of this subtitle repeat the substance of provisions of present Art. 31 that, before enactment of this subtitle, applied to political subdivisions and their units and instrumentalities, as well as to units and instrumentalities of the State. In light of this subtitle, provisions of Art. 31 have been amended to delete the references to the State and its units and instrumentalities. Those provisions of present Art. 31 ultimately will be revised in a local government Article.
The Revisor's Notes to both §§ 1 and 9 of Article 31 similarly reveal that the Legislature intended to delete references to the State and its units and its instrumentalities from Article 31 and insert them, instead, in the new Article.
[10] This situation is analogous to the General Assembly's inadvertent repeal, during code revision, of a provision authorizing a certain "bad check fee." We concluded that the repeal should not be given effect.See 82 Opinions of the Attorney General 165 (1997).
 *Page 152