Dear Secretary Simms:
You requested an opinion concerning a 1998 amendment of State law that essentially incorporates federal standards governing forms that collect racial and ethnic information. Among other things, that legislation directs that the identification of a person's race be made by the individual who is the subject of the form, or by a family member or friend, and permits a multiracial respondent to select "all applicable categories." You ask whether these standards apply to the racial identification of individuals who are wanted by or under the jurisdiction of the criminal justice system in Maryland.
We conclude that the 1998 amendment applies generally to all State forms, including those used by the Department of Public Safety and Correctional Services ("DPSCS"), with two important qualifications. First, the mandate for self-identification and the option to select multiple categories do not pertain to forms that must necessarily be completed by someone other than the person who is the subject of the form. Second, in identifying those forms to which the self-identification requirement applies, we believe that DPSCS may appropriately look for guidance to the practice of federal agencies with which it coordinates its activities.
 I Federal Guidelines for Racial Designations on Government Forms
The State law that is the basis of your question finds its source in federal administrative guidelines on racial and ethnic classifications. The development of those guidelines is instructive in construing the State statute, which was designed to mimic the current federal guidelines.
A. Directive No. 15 (1977)
In 1977, the federal Office of Management and Budget ("OMB") adopted guidelines for the collection of data and recordkeeping concerning race and ethnicity in federal programs. OMB Circular No. A-46, § 7(h) (as revised May 12, 1977). A year later, responsibility for the establishment and enforcement of federal statistical standards was transferred to the Department of Commerce, which reissued those guidelines as "Directive No. 15," the title by which the standards have become known.
Directive No. 15 was one of 19 statistical policy directives that the Department issued to federal agencies, contractors, and grantees for the purpose of establishing "uniform statistical standards and guidelines for the collection and compilation of statistical data." Department of Commerce, Directives for theConduct of Federal Statistical Activities, 43 Fed. Reg. 19260 (May 4, 1978). The Department of Commerce identified the objectives of these directives as:
 greater efficiency in the design and conduct of statistical surveys; reduction in the reporting burden on respondents; greater uniformity and comparability among statistical series and studies; and improved accuracy and timeliness of Federal statistics.
Id. at 19261. Other directives dealt with such matters as the definition of a standard metropolitan statistical area; the definition of poverty; classification of businesses, occupations, and scientific and engineering fields; and similar matters. Id. at 19261-73.
Directive No. 15 defined five racial and ethnic categories for use in federal data collection: (a) American Indian or Alaskan Native; (b) Asian or Pacific Islander; (c) Black; (d) Hispanic; and (e) White.[1] The directive expressed a preference for collecting certain ethnic information — i.e., whether or not a person is of Hispanic origin — separately from information about race. 43 Fed. Reg. at 19269. In the preferred format, a form would have two questions: one as to whether a person was of Hispanic ancestry, and a second requiring selection of one of the remaining four racial categories. If that preferred format could not be used, "Hispanic" would be treated as a racial category, and an individual would be classified in one of the five specified categories.[2]
Directive No. 15 did not include a multiracial category, nor did it permit a person to choose more than one race. For persons of mixed racial or ethnic heritage, the directive instructed:
 The category which most closely reflects the individual's recognition in his community should be used for purposes of reporting on persons who are of mixed racial and/or ethnic categories.
43 Fed. Reg. at 19269. Thus, under the directive, the appropriate classification of an individual was based on a standard of external observation rather than individual self-identification.
The directive also contained instructions on the presentation of racial data in reports. For example, it specified collective terms for various groupings of racial categories and eliminated use of the term "nonwhite" as a collective description of minority groups. 43 Fed. Reg. at 19270. OMB stated that the standards set forth in the directive were to be used for civil rights compliance reporting, general program administrative and grant reporting, and statistical reporting. Id. at 19269.
B. Debate over Directive No. 15 (1988-1997)
By the late 1980's, dissatisfaction with Directive No. 15 led OMB, which had reacquired responsibility for the statistical guidelines, to consider modification of the directive. A 1988 proposal to add a new racial category denominated "other" met substantial resistance and was dropped.[3] 53 Fed. Reg. 1542, 1551 (January 20, 1988). In 1993, during congressional hearings on the measurement of race and ethnicity in the decennial census, OMB announced that it would conduct a comprehensive review of Directive No. 15. 62 Fed. Reg. 36874, 36880. OMB stated that it undertook the review after receiving comments that "the categories set forth in Directive No. 15 are becoming less useful in reflecting the diversity of our Nation's population."59 Fed. Reg. at 29831.
As it undertook that review, OMB stressed that "[a]ppreciation of the intended uses of the data helps determine what categories make sense." 59 Fed. Reg. at 29833. In seeking comment on the possible revision of the racial and ethnic categories, OMB set forth a number of governing principles. Those principles stressed the use to which the data would be put:
 foremost consideration should be given to data aggregations by race and ethnicity that are useful for statistical analysis, program administration and assessment, and enforcement of existing laws and judicial decisions, bearing in mind that the standards are not intended to be used to establish eligibility for participation in any Federal program.
59 Fed. Reg. at 29834. Those principles also cautioned that any revision "should be operationally feasible." Id.
As part of its review, OMB established the Interagency Committee for the Review of the Racial and Ethnic Standards ("Interagency Committee"), comprised of more than 30 agencies representing federal users of data on race and ethnicity. According to OMB, the Interagency Committee was designed to encompass "all agency stakeholders." 62 Fed. Reg. at 36880. However, it is notable that, for the most part, the federal criminal justice agencies were not represented.[4] In May 1997, the Interagency Committee issued a lengthy report analyzing various options for revision of Directive No. 15. See Report tothe Office of Management and Budget on the Review of StatisticalPolicy Directive No. 15. 62 Fed. Reg. 36877-946 (July 9, 1997).
The debate over Directive No. 15 is outlined in the Interagency Committee's Report, and in a series of notices issued by OMB prior to the report, seeking public comment on possible revision of the federal guidelines. See 59 Fed. Reg. 29831-35 (June 9, 1994); 60 Fed. Red. 44674-93 (August 28, 1995);62 Fed. Reg. 36874-946 (July 9, 1997).
OMB noted that "[a]t the heart of criticism and public requests for review of Directive No. 15 is the feeling of some persons that they cannot accurately identify their race and ethnicity as they prefer. . . ." 60 Fed. Reg. at 44679. Some of the proposed revisions of Directive No. 15 sought to add new racial categories (e.g., a "Middle Easterner" category) or to rename existing categories (e.g., substitute "African American" for "Black"). 59 Fed. Reg. at 29832-33. Two key issues relevant to your inquiry were whether to create a "multiracial" category and whether an individual's classification should be based on self-identification or "third party identification."59 Fed. Reg. at 29833.
The issues of a multiracial classification and self-identification animated the debate over the 1977 guidelines and were inextricably linked. According to OMB, differing views on whether and how to create a multiracial classification "engendered the most controversy in the present review."60 Fed. Reg. at 44685. OMB entertained a number of solutions to that controversy: a "multiracial" category under various possible labels, a neutral "other" category, an open-ended question, a skin-color gradient, and an option for a respondent to select multiple racial categories, among others.60 Fed. Reg. at 44685-89.
OMB noted that agencies that used racial and ethnic classification data for civil rights monitoring and enforcement, policy development, and program evaluation generally opposed creation of a multiracial category and favored observer perception over individual self-identification. 60 Fed. Reg. at 44677. From that perspective:
 whether someone is a victim of discrimination often turns on the way in which others act on their perception of, for example, the color of the individual's skin, the ethnic origin of his or her last name, or the accent with which he or she speaks. Such issues do not depend generally on the way in which the individual identifies his or her racial or ethnic background.
60 Fed Reg. at 44675. On the other hand, OMB noted that, while racial information on census forms and vital records had once been gathered by third party observation, the current trend favored self-identification by the individual or a family member because:
 self-identification is important to many people. . . . Many people of more than one race, who under Directive No. 15 are told to choose one category . . ., said they wanted to reflect their full heritage, not just part of it.
60 Fed. Reg. at 44676. Thus, the motivation for self-identification was linked to the desire of some individuals to identify themselves or their children as multiracial.[5]
 3. Revision of Federal Standards (1997)
After receiving and reviewing comments, OMB opted for a compromise solution and issued a new, now unnumbered, directive entitled Standards for Maintaining, Collecting, and PresentingFederal Data on Race and Ethnicity. 62 Fed. Reg. 58782 (October 30, 1997). The new standards modified and relabeled the classifications of Directive No. 15. In a departure from the original directive, the new standards also stated a preference for self-identification with an option for a person to identify with more than one racial category. Id.
With respect to the phrasing and format of questions, OMB retained the preference for a two-step format, including a question concerning Hispanic or Latino[6] ethnicity separate from the racial categories. Within the racial categories, the revision created a new "Native Hawaiian and other Pacific Islander" category distinct from the Asian category. Finally, although OMB declined to add a "multiracial" category, the new standards permitted individuals of mixed racial heritage to select more than one racial category.
A respondent is now to choose one of two categories under ethnicity and "all appropriate categories" under race as follows:
 (1) Ethnicity: Hispanic or Latino Not Hispanic or Latino
 (2) Race: American Indian or Alaska Native Asian Black or African American Native Hawaiian or Other Pacific Islander White
When self-identification is "not practicable or feasible," a form is to include the Hispanic or Latino classification as one of six categories in a combined racial and ethnic listing.62 Fed. Reg. at 587-89. Thus, the federal guidelines now contain a presumption that the selection of a person's race or ethnicity on a federal form will be made by the individual, as well as an option for that individual to select more than one racial category.
 II Racial Designations on State Forms in Maryland
Certain Maryland forms have collected information concerning racial and ethnic categories for many years, although prior to 1998 State law neither expressly incorporated Directive No. 15 nor established its own racial categories.[7] The State forms management law established procedures for the maintenance and updating of forms, but did not address the content of forms, much less the question of racial or ethnic designation. See Annotated Code of Maryland, State Government Article ("SG"), § 10-601 et seq.
A. Attempt to Create "Multiracial" Designation (1995)
In 1995, the General Assembly passed a bill that would have amended the State forms management law to add the term "multiracial" as a choice on any form that required identification of an individual by race. See House Bill 215 (1995). The bill did not otherwise specify permissible racial or ethnic categories for State forms.[8] The measure was intended to provide an option for racial self-identification for children "whose parents are socially recognized as belonging to different races." Veto message concerning House Bill 215, Laws of Maryland 1995 at p. 4069; Chapter 300, Preamble, Laws of Maryland 1996. Observing that the effect of the bill went beyond simply providing a self-identification alternative, the Governor vetoed the bill. The Governor cited the then ongoing federal review by OMB, and noted the funding implications of creating categories not recognized by federal agencies:
 For Maryland to add a "multiracial" category at this time would prevent the federal government from accounting for those individuals who choose to identify themselves as multiracial.
 Until the federal government has adjusted its racial identification categories in a manner that is capable of accounting for all of Maryland's citizens, it would be inadvisable to make a unilateral change in those categories. Such a change could have negative consequences with regard to federally-funded programs that are partially based on numbers of individuals who fall within classifications considered to be historically disadvantaged.
Veto message concerning House Bill 215, Laws of Maryland 1995 at pp. 4069-70.
B. Maryland Task Force on Multiracial Designations (1996-97)
During the next legislative session, the General Assembly enacted, and the Governor signed, a bill creating a Task Force on Multiracial Designations ("Task Force"). Chapter 300, Laws of Maryland 1996. The Task Force was charged with "studying issues concerning the possible addition of a multiracial category on State forms that seek racial identification information." Additionally, the Task Force was authorized to develop recommendations for changes in statutes, regulations, or procedures.
The Task Force submitted a report before the 1998 session of the General Assembly. See Report and Recommendations of the TaskForce on Multiracial Designations (December 1, 1997) ("Task Force Report"). The Task Force Report related the history of Directive No. 15, recited the criticisms of the 1977 federal guidelines, and summarized the revised federal standards. Task Force Report at pp. 1-4. The Task Force Report also described comments that the Task Force had received at several public hearings and by correspondence, which favored the addition of a multiracial option. Id. at pp. 8-9.
Based on information it had gathered, the Task Force recommended that the State incorporate the guidelines set forth in the revised federal standards, including the racial and ethnic categories, the two-question format for ethnicity and race, the preference for self-identification, and the option for an individual to identify as multiracial selecting multiple racial categories. The Task Force recommended that, if the respondent were unavailable, information concerning race and ethnicity should be obtained from a family member or friend. Task Force Report at pp. 9-11. The Task Force repeatedly cited the revised federal guidelines to support its recommendations, and noted that adoption of the federal guidelines would "[allow] State agencies to meet reporting requirements" and "provide data in a format that is comparable to the data collected by the federal government." Task Force Report at pp. 9, 10.
The Task Force made a "cursory assessment" of the number of State forms affected by its recommendations and the fiscal impact of those recommendations. It estimated that approximately 800-1000 forms used by State agencies would have to be revised, and that there were likely to be "significant costs" in updating forms, computer programs, and coders' manuals. The Task Force identified DPSCS and the Maryland State Police as among the State agencies most heavily affected by the forms redesign it recommended. Task Force Report at pp. 6-7. However, given that State agencies were required to report to the federal government in the format required by the revised federal standards, and would already be revising their forms for that purpose, the Task Force believed that its recommendations "should not result in additional expenditures." Id.
C. Incorporation of Federal Guidelines in Forms Management Act (1998)
A bill was introduced during the 1998 session of the General Assembly to adopt the recommendations of the Task Force as part of the State forms management law. House Bill 253 (1998). The Governor, the State Superintendent of Schools, and the Chair of the Task Force all urged passage of the legislation, noting its conformity to the revised federal standards. The Floor Report for the bill cited the Task Force Report and concluded that the legislation "mirrors" the revised federal standards. Floor Report for House Bill 253 (1998).
Appearing before the Legislature, the Chair of the Task Force reiterated the Task Force's assessment that the bill would not impose costs in excess of those incurred in complying with the revised federal standards. Testimony of Isabelle L. Horon (February 10, 1998). The fiscal note prepared by the Department of Legislative Services echoed that conclusion, stating that additional State expenditures would be "minimal," because many State agencies would be required to make the same changes in data collection forms to comply with the revised federal guidelines. Revised Fiscal Note for House Bill 253 (March 18, 1998).
The bill was adopted with only technical amendments. See
Chapter 459, Laws of Maryland 1998. It is codified at § 10-606(c) as follows:
 (c)(1) In the preparation of a form that requires identification of individuals by race, a department or independent unit shall include the following racial categories:
(i) American Indian or Alaska Native;
(ii) Asian;
(iii) Black or African American;
(iv) Native Hawaiian or other Pacific Islander; and
(v) White.
 (2) A form that requires identification of individuals by race shall include instructions that multiracial respondents may select all applicable racial categories.
 (3)(i) Respondents shall select their own answers, except when it is not possible for the respondent to do so.
 (ii) In the event that a respondent is not able to select an answer, an observer, such as a family member or friend, may select the answer on behalf of the respondent.
 (4) A form that requires identification of individuals by race shall include a separate question about whether a respondent is of Hispanic or Latino origin, with the question preceding the racial category question.
Thus, § 10-606(c) incorporates the racial and ethnic categories adopted by OMB in the revised federal standards. Like the revised federal guidelines, it expresses a preference for individual self-identification, and it permits a respondent who identifies himself or herself as multiracial to select multiple categories.
 III Application of § 10-606(c) to Criminal Justice Forms
In your request, you note that various forms used by DPSCS and other criminal justice agencies, as well as the computerized criminal justice information system ("CJIS"), routinely record a single racial identifier for each subject, to ensure accurate identification for the purposes of apprehension, custody, and supervision of individuals within the jurisdiction of the criminal justice system. You also state that the primary use of these forms and computer databases is not for demographic or survey purposes, nor are they voluntarily filled out or entered by the subjects. You ask whether the option to choose multiple racial categories and the requirement for self-identification apply to these forms.
A. Standards Generally Apply to Criminal Justice Forms
At first glance, it appears indisputable that § 10-606(c) applies to criminal justice forms used by DPSCS. The term "form" in the Forms Management Act includes any document with "a standard format for the systematic and repetitive collection, maintenance, or transmission of information." § 10-604(d).[9] This definition would apparently cover virtually any form used by DPSCS with respect to persons under its jurisdiction. There is no exception in § 10-606(c) for criminal justice forms; the legislative history cites DPSCS as one of the affected agencies; and the Task Force alluded to the forms of DPSCS and the Maryland State Police, among other agencies, in its report. See Revised Fiscal Note for House Bill 253 (March 18, 1998); Task Force Report at p. 7.
While, as a general principle, the standards for racial classification in § 10-606(c) apply to forms used by DPSCS, those standards must be applied in manner that harmonizes potentially conflicting legal mandates and takes into account the purpose of the form. In construing a statute, the paramount objective is to ascertain and give effect to the intent of the Legislature. Catonsville Nursing Home, Inc. v. Loveman,349 Md. 560, 570, 709 A.2d 749 (1998); Lewis v. State, 348 Md. 648, 653,705 A.2d 1128 (1998); Harris v. State, 344 Md. 497, 510,687 A.2d 970, cert. denied sub nom. Koening v. Maryland, 118 S.Ct. 605
(1997). To discern legislative intent, one must initially look to the language of the statute. Lewis v. State, 348 Md. at 653. In addition to the language of the statute itself, the general purpose, aim, or policy behind the statute also may be scrutinized. Comptroller of the Treasury v. Martin G. Imbach,Inc., 101 Md. App. 138, 145, 643 A.2d 513, cert. denied,336 Md. 593, 650 A.2d 239 (1994). When a mechanically logical interpretation of a phrase results in an illogical result:
 We may and often must consider other "external manifestation" or "persuasive evidence," including a bill's title and function paragraphs, amendments that occurred as it passed through the Legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us. . . .
Kaczorowski v. City of Baltimore, 309 Md. 505, 515, 525 A.2d 628,632-33 (1978). See also Catonsville Nursing, supra, 349 Md. 560,570.
In our opinion, a simple-minded application to all criminal justice forms of the statute's allowance for self-identification and multiracial selection would be at odds with the legislative history and purpose of § 10-606(c), as well as other State and federal laws. Some criminal justice forms necessarily require an accurate description of an individual, including racial and ethnic information, from the perspective of an objective observer. Therefore, the standards allowing self-identification and multiple selection are necessarily at odds with the purposes of these forms. In determining the universe of forms for which self-identification and multiple racial selections are inappropriate, we believe DPSCS may properly refer to the practices of the federal agencies with which it must coordinate its activities, agencies that are subject to the parallel federal standards concerning racial classifications.
B. Circumstances That Require Third Party Identification
In our opinion, the requirement in § 10-606(c) for self-identification, and the concomitant option to select more than one racial category, do not pertain to forms that necessarily require an objective observer's description of an individual. The language of the statute suggests that those standards pertain only to forms that are typically completed by the individual who is the subject of the form. In incorporating the federal preference for self-identification, the State statute provides that:
 (i) Respondents shall select their own answers, except when it is not possible for the respondent to do so.
 (ii) In the event that a respondent is not able to select an answer, an observer, such as a family member or friend, may select the answer on behalf of the respondent.
§ 10-606(c)(3) (emphasis added).
The use of the term "respondent" indicates that this portion of the statute contemplates forms in which an individual "responds" to questions posed on the form — i.e., a form that is ordinarily completed by the individual who is the subject of the form. For example, an application for employment, a voter registration application, or an application for a license would typically be completed by the individual who is subject of the form — i.e., the "respondent."[10]
By way of contrast, many forms used by law enforcement and correctional agencies are devised to record information that will permit an observer to identify accurately the individual who is the subject of the form, regardless of how that individual may prefer to be known. For example, arrest forms, warrants, court commitments, and CJIS information are filled out or entered by a law enforcement or correctional officer, court clerk, or other government employee, not by the individual who is the subject of the record. The primary purpose of these documents is to allow a law enforcement or correctional officer to readily identify an individual who is to be taken into custody, is already in custody, or is under supervision. In such circumstances, self-identification by the subject of the form would not only be impractical, but would be antithetical to the purpose of the form. The individual who is the subject of such a form is not a "respondent" in the parlance of § 10-606(c).
Indeed, with respect to some of these forms, other law mayrequire an objective description of race or ethnicity. For example, under both State and federal law, an arrest warrant must contain a description of the person who is subject to arrest, such that an arresting officer may identify that person with reasonable certainty. "There must be some description sufficient to enable the individual to be identified and distinguished which may be by describing his appearance." 1 C. Alexander, The Law of Arrest
§ 62 (1949). See also Annotated Code of Maryland, Article 27, § 594D-1(a)(1)(i)-(ix) (arrest warrant must include specific descriptive information, including race, if known); Fed.R.Crim.P. 4(c) (arrest form must contain description by which individual can be identified with reasonable certainty). An accurate physical description of the individual is a prerequisite if the individual has used an alias or the name is unknown. See United States v.Jarvis, 560 F.2d 494, 497 (2d Cir. 1977); United States ex rel.Savage v. Arnold, 403 F. Supp. 172 (E.D.Pa. 1975).
A standard of external perception must govern the accuracy of a physical description of an individual subject to arrest by persons who may have no prior familiarity with the individual. Law enforcement and correctional officials must have an accurate means of identifying an individual who is wanted by or under the jurisdiction of the criminal justice system. No one would seriously contend that a suspect — or his or her friends and family — should have final say over the description placed on a warrant for his or her arrest.
The legislative history supports this reading of the statute. In devising the revised federal standards on which § 10-606(c) is based, OMB looked to the purposes for which racial and ethnic data was gathered by federal agencies and identified most of those purposes as pertaining to program evaluation and civil rights enforcement.[11] By contrast, descriptive information about an individual entered on arrest forms, warrants, or court commitments, or into CJIS generally, is not obtained for such purposes, but rather to ensure accurate identification of the individual by officers and employees of criminal justice agencies and the courts.[12]
Despite the broad language of the State statute itself, there is no indication in the OMB releases concerning the federal guidelines in which it was based that the standards were meant to cover law enforcement forms used to identify, apprehend, and track individuals under the jurisdiction of the criminal justice system. Indeed, the units of federal law enforcement agencies with responsibility for those functions did not participate in the formulation of the revised federal guidelines, suggesting that their application to such forms was not contemplated. Moreover, we understand that application of the federal standards to law enforcement databases is currently under study.[13]
The Maryland Task Force Report also suggests that the Task Force contemplated forms that ordinarily could be completed by the individual who is the subject of the form. In giving an example of a circumstance in which another person (such as a friend or family member) would substitute for the respondent's self-identification, the Task Force referred to circumstances in which the individual was "incapacitated" and therefore incapable of completing a form the individual could normally complete. See Task Force Report at p. 11. Nothing in the Task Force Report or the legislative history of § 10-606(c) suggests that the General Assembly was taking the radical step of mandating self-identification of fugitives by their friends and families.
C. Coordination with Related Federal Forms
As indicated above, DPSCS must determine which of its forms are subject to the mandate of § 10-606(c) on self-identification and multiracial selection. In exercising that judgment, we believe that DPSCS may appropriately look for guidance to the forms used by the federal agencies with which it coordinates its activities.
The Task Force Report and the legislative history of § 10-606(c) make clear that the 1998 legislation was carefully designed to conform Maryland forms to the new federal guidelines. The Task Force Report repeatedly cited those guidelines as support for its recommendations. In the same vein, the Task Force Report and the fiscal note for the 1998 legislation discounted the costs of the State forms legislation, on the basis that State agencies would already be changing their forms to comply with the revised federal standards. Moreover, the requirements of § 10-606(c) must be harmonized with the existing legislative mandate to maintain "an accurate and efficient" criminal justice information system "consistent with applicable federal law and regulations." Annotated Code of Maryland, Article 27, § 742(a). See White v.Prince George's County, 282 Md. 641, 387 A.2d 260 (1978) (statutes must be harmonized).
In our opinion, DPSCS is not required to allow self-identification or multiracial selection in a form, if the application of § 10-606(c) is doubtful and if such a revision would impede State-federal coordination. Thus, for example, if a federally run criminal justice database only permits a single racial identifier, in our opinion, a State form designed to collect or retrieve information with respect to that database need not allow for selection of multiple racial categories for an individual.[14]
 IV Conclusion
In summary, we conclude that § 10-606(c) applies generally to all State forms, including those used by DPSCS and other criminal justice agencies. However, the statute's requirement for self-identification and the option to choose multiple racial categories do not pertain to forms that must necessarily contain an accurate observer-based description of an individual. In determining the universe of such forms, DPSCS may appropriately refer to the practice of the federal agencies with which it must coordinate its activities, agencies that are subject to parallel federal requirements.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Kimberly Smith Ward Assistant Attorney General
_____________________ Robert N. McDonald Chief Counsel Opinions Advice
[1] These categories were the product of the Federal Interagency Committee on Education (FICE), which had issued a report in the early 1970's deploring the lack of useful data on racial and ethnic groups. With the encouragement of the Secretary of Health, Education, and Welfare, FICE created an Ad Hoc Committee on Racial and Ethnic Definition, with 25 members drawn from the federal agencies most responsible for the collection and use of data on race and ethnicity. The Ad Hoc committee was charged with developing common categories and definitions of racial and ethnic groups, to facilitate federal collection of racial and ethnic enrollment and other educational data. The categories developed by that committee were tested at selected federal agencies for one year, and then distributed for comment to other agencies, before OMB adopted them in 1977. See59 Fed. Reg. 29831-32 (1994).
[2] The directive permitted an agency to collect additional detail, so long as the data could be aggregated into the specified classifications. 43 Fed. Reg. at 19269. For example, an agency might collect data concerning tribal affiliation of Native Americans for a particular purpose, but the tribal totals could also be aggregated under the "American Indian" heading.
[3] Although multiracial and multiethnic groups, as well as some education organizations, favored the proposal, it drew strong opposition from the Civil Rights Division of the Department of Justice, the Department of Health and Human Services, the EEOC, large corporations, and some representatives of minority groups.59 Fed. Reg. at 29832.
[4] The only units of the Department of Justice that were represented on the committee were the Bureau of Justice Statistics, the Civil Rights Division, and the Immigration and Naturalization Service. Agencies within the Department of Justice that have general law enforcement or correctional functions — e.g. the FBI, DEA, U.S. Marshal's Service, Bureau of Prisons — were not represented. The Department of the Treasury, which contains other major federal law enforcement agencies such as the Secret Service, Internal Revenue Service, and Bureau of Alcohol, Tobacco and Firearms, was not included at all. See 62 Fed. Reg. at 36880-81.
[5] See Hernandez, "Multiracial" Discourse: RacialClassifications in an Era of Color-Blind Jurisprudence, 57 Md. L. Rev. 97, 106-13 (1998) (attributing impetus for multiracial category to interracial couples forced under Directive No. 15 to select one category for their children).
[6] The phrase "Hispanic or Latino" was also substituted for the term "Hispanic" used in Directive No. 15.62 Fed. Reg. 58789. In addition, the new standard also specified that the question concerning Hispanic or Latino ethnicity should be posedbefore the question concerning race, to avoid potential confusion. Id. at 58786, 58789.
[7] In practice, the categories established in Directive No. 15 were commonly used by those Maryland agencies that collected data concerning racial and ethnic groups. Report andRecommendations of the Task Force on Multiracial Designations
(December 1, 1997) at p. 2.
[8] The bill would have added the following language to SG, § 10-606:
 (c) In preparation of a form that requires identification of race, a department or an independent unit of the State Government shall include the term "multiracial" as a choice of race.
[9] The broad definition of "form" in the State Forms Management Act predates the 1998 legislation and has been part of the Act since its inception. Chapter 981, Laws of Maryland 1978. The purpose of the Act is to "promote efficiency in the development and use of forms." Baker v. State, 89 Md. App. 564,569, 598 A.2d 851 (1991). The Act requires each State agency to have a plan for management of its forms and a register of approved forms. § 10-605, 10-606. It charges State agencies with ensuring that government forms are related to legitimate government business, not duplicative or burdensome to the public, and clearly written and composed. The broad definition of "form" in § 10-604(d) appears designed to ensure that all State forms share those virtues. The Act does not purport to create legal rights for those who use or are the subjects of State forms. SeeBaker, supra; Lomax v. Comptroller, 88 Md. App. 50, 591 A.2d 1311
(1991) (alleged failure of tax form to comply with Act did not excuse individual's failure to file tax return).
[10] The term "respondent" also appears in paragraphs (c)(2) and (c)(4) of the statute. See pp. 10-11 supra.
[11] OMB identified certain specific examples of the use of racial and ethnic data as follows:
• enforcing the requirements of the Voting Rights Act;
• reviewing State redistricting plans;
 • collecting and presenting population and population characteristics data, labor force data, education data, and vital and health statistics;
 • establishing and evaluating Federal affirmative action plans and evaluating affirmative action and discrimination in employment in the private sector;
 • monitoring the access of minorities to home mortgage loans under the Home Mortgage Disclosure act;
• enforcing the Equal Credit Opportunity act;
 • monitoring and enforcing desegregation plans in the public schools;
 • assisting minority businesses under the minority business development programs; and
• monitoring and enforcing the Fair Housing Act.
59 Fed. Reg. at 29833.
[12] Of course, information concerning race and ethnicity may ultimately be derived from such forms to determine, for example, whether the death penalty is disproportionately imposed on members of different racial groups, or to compute the relative rates of arrest and conviction among different groups. However, if the original purpose for recording such information is to obtain an accurate observer-based description, the later ancillary use of such data does not change the nature of the form.
[13] Telephone call between Cynthia Barnett, Federal Bureau of Investigation, Criminal Justice Information, Services Division, and Robert N. McDonald, Assistant Attorney General (February 7, 2000).
[14] For example, in order to conduct the State and national criminal background checks of school and child care employees mandated by Annotated Code of Maryland, Family Law Article, § 5-561, law enforcement agencies use a fingerprint form required by the FBI which allows for only a single racial identifier. A separate State form which allowed for multiple racial selections for an individual would be incompatible with the federal requirement. It is also notable that self-identification of an individual on such a form might allow an individual to evade the required background check.
 *Page 58